Sim Gill (Utah State Bar No. 6382)
DISTRICT ATTORNEY FOR SALT LAKE COUNTY
Darcy M. Goddard (Utah State Bar No. 13426)
Donald H. Hansen (Utah State Bar No. 1332)
Deputy District Attorneys
2001 South State Street, Room S3600
Salt Lake City, Utah 84190-1200
Telephone: 385.468.7700
Facsimile: 385.468.7800
E-mail:  dgoddard@slco.org
          dhansen@slco.org

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NATALIE MARIE STEVENSON, mother, personal representative, and heir to LINDSEY GOGGIN, deceased, and THE ESTATE OF LINDSEY GOGGIN, by her Personal Representative Natalie Stevenson, <br><br>       Plaintiffs, <br><br>    v. <br><br> SALT LAKE COUNTY, et al., <br><br>       Defendants. | **DEFENDANTS'** <br> **MOTION FOR SUMMARY JUDGMENT** <br> **AND** <br> **MEMORANDUM IN SUPPORT** <br><br> Case No.:  2:12-cv-00044-PMW <br><br> Judge:  The Honorable Paul M. Warner |

Defendants Salt Lake County, Sheriff James M. Winder, former Jail Commander Rollin Cook, current and former Salt Lake County employees Julie (Evans) Carter, Diane (Elizabeth) Hardy, and Kristyn Smith (collectively, "County Defendants"), Wellcon, Inc., Wellcon LLC (collectively, "Wellcon") and Wellcon employees or independent contractors Dr. Russell Vinik, M.D. and Dr. Todd Wilcox, M.D. ("Wellcon Defendants"), submit this Motion for Summary Judgment and Memorandum in Support.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case arises from the in-custody death of Lindsey Goggin at the Salt Lake County Adult Detention Center ("ADC") on August 15, 2010. (*See generally* Pl's Compl. (Doc. No. 1).) In an apparent "shotgun approach" to litigation, Ms. Goggin's mother, Plaintiff Natalie Stevenson ("Plaintiff"), named as Defendants not only Salt Lake County ("County") and Wellcon, the County's contracted healthcare provider at the ADC, but also three individual nurses, each of whom saw and treated Ms. Goggin only one time, three doctors, two of whom never met or treated Ms. Goggin at all,[1] and both Sheriff James Winder and Former Chief Rollin Cook, neither of whom were directly involved in Ms. Goggin's care or treatment at the ADC.[2]

The undisputed facts in this case demonstrate that Defendants, and each of them, are entitled to summary judgment on each of Plaintiff's four causes of action—all of which rest on

---

[1]  One such doctor, Eric Lindley, has since been dismissed without prejudice.  (Doc. No. 44.) So, too, was the medical transcriptionist who was initially named as a party.  (Doc. No. 35.)

[2]  Despite this initial "shotgun approach," Plaintiff has not conducted any discovery in the <u>two (2) years</u> this case has been pending.  Only recently, a full <u>six (6) months after</u> the already once-extended fact discovery deadline had passed and only two (2) weeks before dispositive motions were due, did Plaintiff seek another extension of time to conduct all her fact and expert discovery.  (Doc. No. 45.)  Defendants oppose that request. (Doc. No. 47.)

the unsupported, and insupportable, allegation that Defendants were "deliberately indifferent" to Ms. Goggin's "serious medical needs" in violation of the United States and Utah Constitutions. To the contrary, the undisputed—and indisputable—facts show Ms. Goggin: (i) was screened by three separate health care professionals when she was being booked into the ADC on August 11, 2010; (ii) was monitored at least twice daily between August 12 and August 15, 2010, to ensure her Clinical Institute Withdrawal Assessment scores and vital signs were consistent both with withdrawal patients generally and with her own baseline; (iii) was promptly assessed and treated by nursing professionals and doctors when she requested assistance or was reported to be vomiting in her cell; (iv) was timely and consistently provided with electrolyte replacement fluids to assist with proper hydration; (v) was prescribed and given medication to treat her nausea and vomiting; and (vi) was referred to the Doctor Call List, and then transferred to the ADC's Acute Medical Unit, once her heart rate increased over her baseline and was not responsive to oral fluids.

Based on the records of extensive interactions by Ms. Goggin with medical personnel at the ADC, as well as their documented efforts to treat Ms. Goggin's observed condition and reported complaints, no reasonable juror could conclude that Defendants, or any of them, violated Ms. Goggin's federal or state constitutional rights, i.e., that they were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[ew] the inference," *Farmer v. Brennan*, 511 U. S. 825, 837 (1994), but nonetheless deliberately disregarded it, *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

For the same reasons, no reasonable juror could conclude that the County or the named supervisory defendants are liable for any constitutional violation under any theory, including

2

"failure to train" or "to supervise," or adoption of a constitutionally deficient "policy, practice, or custom."

For these reasons and others more fully discussed below, Defendants are entitled to judgment as a matter of law on each of Plaintiff's causes of action and dismissal of her case in full and with prejudice.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"The movant bears an initial burden to show an absence of evidence to support an essential element of the non-movant's case." *Johnson v. City of Bountiful*, 996 F. Supp. 1100, 1102 (D. Utah 1998); *see also Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997) ("The moving party need not affirmatively negate the nonmovant's claim in order to obtain summary judgment.  Instead, the movant only bears the initial burden of showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." (internal citation and quotation marks omitted)).

If the movant carries its initial burden, the nonmovant may not rest upon her pleadings, but must instead "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (quotation marks omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* (citing *Thomas v. Wichita Coca Cola Bottling Co.*,

968 F.2d 1022, 1029 (10th Cir. 1992).  "The mere existence of a scintilla of evidence in support

of the [non-moving party's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the plaintiff."  *Salehpoor v. Sahinpoor*, 358 F.3d 782, 786 (10th

Cir. 2004).

## STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS

1.     **Count One:  Claim for Cruel and Unusual Punishment under the Eighth Amendment of the United States Constitution.**

    **A.     Statement of Elements**

Plaintiff Natalie Stevenson ("Plaintiff") may recover in this case for the alleged "cruel

and unusual punishment" of her daughter Lindsey Goggin ("Ms. Goggin") only if Defendants

were "deliberate[ly] indifferen[t] to the serious medical needs" of Ms. Goggin.[3]  *See Estelle v.*

*Gamble,* 429 U.S. 97, 104 (1976).

The test for "deliberate indifference" under the Eighth Amendment has "both an

objective and a subjective component."  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir.

2000).

The objective component is met if the harm suffered is "sufficiently serious" to implicate

the Cruel and Unusual Punishment Clause.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)

(internal quotation marks omitted).

The subjective component "is met if a prison official 'knows of and disregards an

excessive risk to inmate health or safety.'"  *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S.

---

[3] "Under the Fourteenth Amendment due process clause, 'pretrial detainees are  . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates' under the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake Cty.*, 768 F.2d 303, 307 (10th Cir. 1985)).

at 837).  The subjective component requires "inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment."  *Farmer*, 511 U.S. at 838.  It is not enough to allege that prison officials failed "to alleviate a significant risk that [they] should have perceived but did not."  *Id.* at 838; *Estelle*, 429 U.S. at 105-06 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'").  Instead, to show "the requisite deliberate indifference," a plaintiff must show "the official [was] both [] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.   Importantly, "[i]f an official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that harm, he bears no liability under this standard." *Despain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001) (citing *Farmer*, 511 U.S. at 844; *MacKay v. Farnsworth,* 48 F.3d 491, 493 (10th Cir. 1995)).

## B.   Undisputed Material Facts

1.   Lindsey Goggin was taken into custody by law enforcement on charges of possession of a controlled substance and possession of drug paraphernalia, and repeated drug-related parole violations, in the late afternoon or early evening on August 11, 2010.  (SLCo Stevenson 000208.[4])

2.   Ms. Goggin was delivered to the ADC by law enforcement officers before 7:45 p.m. on August 11, 2010.  (*Id.*; *see also* SLCo Stevenson 000089.)

---

[4] All non-medical records referenced in Defendants' Statement of Elements and Undisputed Material Facts are authenticated as business records of the Salt Lake County Adult Detention Center by, and are attached as an exhibit to, the Declaration of Lieutenant Rocky Finocchio (Jan. 29, 2014), which is attached hereto as Exhibit 1.

3.      Prior to accepting any inmate for booking into the ADC, the nursing staff will
conduct what is known as a "Nursing Pre-Screen Examination."  (Fact and Expert Declaration of
Dr. Todd R. Wilcox, M.D. (Jan. 31, 2014) ("Wilcox Decl.") (to be filed under seal), at ¶ 6; SLCo
Stevenson 000342-000349.)  If serious health problems are detected during that examination, the
prisoner is referred to a hospital for care prior to being approved for entrance into the ADC.
(Wilcox Decl. at ¶ 6.)

4.      During her Nursing Pre-Screen Examination, conducted at approximately 7:45
p.m. on August 11, 2010, Ms. Goggin denied any use of illegal drugs.  (SLCo Stevenson
000146[5]; Wilcox Decl. at ¶ 7.)

5.      Based on that representation and Ms. Goggin's other statements and physical
examination results at that time, Ms. Goggin was cleared for booking into the jail.  (SLCo
Stevenson 000146; Wilcox Decl. at ¶ 8.)

6.      At the conclusion of her Nursing Pre-Screen Examination, Ms. Goggin was
referred for a Comprehensive Mental Health Interview.  (*See* SLCo Stevenson 000146; *see also*
SLCo Stevenson 000353-000355.)

---

[5] All medical records referenced in Defendants' Statement of Elements and Undisputed Material
Facts are authenticated as business records of Wellcon or the ADC by, and are attached as an
exhibit to, the Fact and Expert Declaration of Dr. Todd R. Wilcox, M.D. (Jan. 31, 2014).
Because the medical records are and contain confidential and protected health information
concerning Ms. Goggin, Defendants have moved the Court for permission to file Dr. Wilcox's
Declaration (with Exhibits) under seal.  (*See* Doc. No. 50.)
        Dr. Wilcox was previously designated by Defendants as an expert witness in, among
other things, (i) correctional healthcare generally, (ii) ADC policies and procedures relating to
drug withdrawal patients, (iii) the standards of care applicable to recognizing, assessing,
monitoring, and treating symptoms of alcohol or drug withdrawal in the correctional healthcare
setting, and (iv) Defendants' compliance with (or exceeding of) all applicable correctional health
service standards in this case.  (*See* Defendants' Expert Witness Designation (Nov. 27, 2013),
attached hereto as Exhibit 2.)

7.      During her Comprehensive Mental Health Interview, conducted later that evening at approximately 9:45 p.m., Ms. Goggin acknowledged past substance abuse treatment and admitted to drinking alcohol approximately one time per month and to using crack cocaine and heroin (the latter in an amount of approximately two baggies/day).  Ms. Goggin stated she had used heroin for one or two years and had last used it earlier that day.  (SLCo Stevenson 000136-000137.)  She also reported having used crack cocaine earlier that day.  (*Id.*)

8.      Based on that information, the mental health professional diagnosed Ms. Goggin as having opiate and cocaine dependency, and classified Ms. Goggin as having "positive risk factors for withdrawal."  (SLCo Stevenson 000137.)  The mental health professional also referred Ms. Goggin for a follow-up assessment. (*Id.*)

9.      Shortly thereafter, Ms. Goggin received a Comprehensive Nursing Evaluation. (SLCo Stevenson 000135; *see also* SLCo Stevenson 000350-000352.)

10.     During her Comprehensive Nursing Evaluation, conducted at approximately 10:54 p.m. on August 11, 2010, Ms. Goggin admitted to drinking alcohol approximately one time per week and to using crack cocaine and heroin (the latter in an amount of approximately two grams/day).  Her vitals were taken and registered well within the range of normal, with blood pressure of 123/79 and a heart rate of 75.  (SLCo Stevenson 000135; Wilcox Decl. at ¶ 13.)

11.     Based on that information, the booking nurse classified Ms. Goggin as having "positive risk factors for withdrawal" but noted she was asymptomatic at that time.  (SLCo Stevenson 000135.)

12.     The booking nurse also issued Ms. Goggin a bottom bunk clearance for her safety

and ordered that she receive daily assessments for symptoms of withdrawal.  (*Id*.; Wilcox Decl. at ¶ 15.)

13.     One of the assessments for withdrawal from drugs or alcohol that is routinely used by medical personnel at the ADC and most other correctional facilities and hospitals in the United States is a "CIWA score," which stands for "Clinical Institute Withdrawal Assessment." (Wilcox Decl. at ¶ 16; *see also* SLCo Stevenson 000356-000358.)  The CIWA score is an internationally validated assessment tool that has been in use for many years and is considered to be the gold standard for assessing patients experiencing signs and symptoms of withdrawal. (Wilcox Decl. at ¶ 16.)

14.     In calculating an inmate's CIWA score, medical personnel are trained to take into account a variety of withdrawal symptoms, such as nausea, sweating, anxiety or agitation, headaches, and hallucinations.  (Wilcox Decl. at ¶ 17; *see also* SLCo Stevenson 000207 (Ms. Goggin's comprehensive CIWA Worksheet).)  Each symptom that is reported or observed is assigned a score ranging from zero to seven.  (Wilcox Decl. at ¶ 17.)  The numbers are then added up and recorded as an inmate's total CIWA "score."  (*Id*.)

15.     In general, and as reflected in the policies of the ADC, medical intervention is initiated once a CIWA score reaches twelve.  (Wilcox Decl. at ¶ 18.)

16.     In addition to the CIWA score, medical professionals at the ADC are also trained to closely monitor the vital signs of inmates withdrawing from alcohol or drugs.  The measurement of vital signs provides an objective "cross-check" for an inmate's regular CIWA assessments.  (*Id*. at ¶ 19; *see also* SLCo Stevenson 000356-358.)

17.     Following Ms. Goggin's Comprehensive Nursing Evaluation, a nurse recorded on

8

Ms. Goggin's CIWA Worksheet and logged into the ADC's computerized medical records system Ms. Goggin's CIWA score, which at that time was zero.  (*See* SLCo Stevenson 000206, -000207.)

19.  18.    Her vital signs were also assessed and were well within the range of normal, with blood pressure of 123/79, heart rate of 75, and a temperature of 97.6.  (SLCo Stevenson 000207; Wilcox Decl. at ¶ 21.)

19.    At approximately 8:00 a.m. the next morning, August 12, 2010, Ms. Goggin's CIWA score was assessed, recorded on her CIWA Worksheet, and logged into the ADC's computerized medical records system.  Again, her CIWA score was zero.  (*See* SLCo Stevenson 000204, -000207.)

20.    Her vital signs were again assessed and she had a blood pressure of 126/85, a slightly elevated heart rate of 130, and a temperature of 97.0.  (SLCo Stevenson 000207; Wilcox Decl. at ¶ 23.)  This is not uncommon for individuals withdrawing from alcohol or drugs, nor is it cause for concern.  (Wilcox Decl. at ¶ 23.)  Ms. Goggin was given Gatorade to ensure she remained properly hydrated.  (SLCo Stevenson 000207; Wilcox Decl. at ¶ 23.)

21.    Gatorade or other electrolyte replacement fluids are commonly prescribed at the ADC to assist with rehydrating patients who experience nausea and vomiting.  The use of Gatorade in a correctional facility is rare; most facilities use only water, which is not nearly as effective.  (Wilcox Decl. at ¶ 24.)

22.    At approximately 3:30 p.m. that same day, August 12, 2010, Ms. Goggin's CIWA score was again assessed, recorded on her CIWA Worksheet, and logged into the ADC's computerized medical records system.  At that time, her CIWA score was three, with two points

(out of seven) assessed for nausea and one point (out of seven) assessed for tremors.  (SLCo Stevenson 000205, -000207.)

23.     A recorded score of two points for nausea would place Ms. Goggin somewhere between "mild nausea, no vomiting" (one point) and "intermittent nausea and dry heaves" (four points).  (SLCo Stevenson 000207.)  This is not uncommon for individuals withdrawing from alcohol or drugs, nor is it cause for concern.  (Wilcox Decl. at ¶ 26.)

24.     Her vital signs remained normal for a withdrawal patient, with blood pressure of 123/85, heart rate of 108, and a temperature of 98.8.  (SLCo Stevenson 000207; Wilcox Decl. at ¶ 27.)  Her heart rate had come down likely in response to the administration of Gatorade.  (Wilcox Decl. at ¶ 27.)

25.     Ms. Goggin had a follow-up CIWA assessment early the next morning, August 13, 2010, at approximately 7:12 a.m.  At that time, she was again assessed with a CIWA score of three, with three points (out of seven) assessed for nausea.  (SLCo Stevenson 000207.)

26.     Her vital signs showed a slight elevation in blood pressure, i.e., 142/96, with a slightly elevated heart rate of 117 and temperature of 96.9.  (SLCo Stevenson 000207; Wilcox Decl. at ¶ 29.)  Again, that was not unusual.  (Wilcox Decl. at ¶ 29.)  Ms. Goggin was again given Gatorade to ensure she remained properly hydrated.  (SLCo Stevenson 000207; Wilcox Decl. at ¶ 29.)

27.     At approximately 3:00 p.m. that day, August 13, 2010, Ms. Goggin's CIWA score was again assessed as a three, with three points (out of seven) assessed for nausea.  (*Id.*; *see also* SLCo Stevenson 000203.)  Her CIWA score was recorded on her CIWA Worksheet and logged into the ADC's computerized medical records system.  (SLCo Stevenson 000207, -000203.)

28.     Her vital signs were taken and were well within the range of normal for a withdrawal patient, with blood pressure of 133/96, heart rate of 117, and a temperature of 98.0. (SLCo Stevenson 000207; Wilcox Decl. at ¶ 31.)  She was given more Gatorade to ensure proper hydration.  (SLCo Stevenson 000207; Wilcox Decl. at ¶ 31.)

29.     Ms. Goggin was also seen late at night on August 13, 2010, by a "triage nurse," Kristyn Smith.  (SLCo Stevenson 000186.)  Ms. Goggin reported "difficulty breathing from heroin withdrawal," "vomiting all day," and chest pains.  (*Id.*)

30.     Contrary to her earlier statements to nursing staff on August 11, 2010, she told Nurse Smith that she had been using "5 balloons of heroin a day for the past six months."  (*Id.*)

31.     Nurse Smith checked Ms. Goggin's vital signs, which were within the range of normal for a withdrawal patient, i.e., blood pressure of 134/84 and heart rate of 111.  (SLCo Stevenson 000186; Wilcox Decl. at ¶ 34.)

32.     Regardless, Nurse Smith called the on-call doctor, Dr. Russell Vinik, M.D., to advise him of Ms. Goggin's complaints and, on Dr. Vinik's orders, filled a prescription for Ms. Goggin of oral Phenergan to be taken twice daily for the next three days.  (SLCo Stevenson 000186, -000183, -000196-197.)

33.     Phenergan is an effective anti-nausea medication often prescribed at the ADC and other correctional facilities and hospitals nationwide to treat patients who are experiencing nausea and vomiting.  (Wilcox Decl. at ¶ 36.)

34.     Records indicate Ms. Goggin received her Phenergan as prescribed on August 14 and 15, 2010.  (SLCo Stevenson 000183; Wilcox Decl. at ¶ 37.)

35.     Records indicate that was Nurse Smith's only medical interaction with Ms.

Goggin.  (Wilcox Decl. at ¶ 38.)

36.    Ms. Goggin was again seen at approximately 9:00 a.m. in the morning on August 14, 2010.  (SLCo Stevenson 000207, -000201.)  At that time, she was again assessed with a CIWA score of three, with three points (out of seven) assessed for nausea.  (SLCo Stevenson 000207.)  Her CIWA score was recorded on her CIWA Worksheet and logged into the ADC's computerized medical records system.  (SLCo Stevenson 000207, -000201.)

37.    Her vital signs showed a slight elevation in blood pressure, i.e., 142/94, with a slightly elevated heart rate of 104 and a temperature of 97.2.  (*Id*.)  This is not uncommon for individuals withdrawing from alcohol or drugs, nor is it cause for concern.  (Wilcox Decl. at ¶ 40.)  Additionally, these results were consistent with her previous vital sign measurements and CIWA scores.  (*Id*.)

38.    The same nurse saw Ms. Goggin again at approximately 2:30 p.m. on August 14, 2010.  (SLCo Stevenson 000207, -000202.)  Her CIWA score was unchanged and her blood pressure was back within the range of normal, i.e., 134/91.  (SLCo Stevenson 000207; Wilcox Decl. at ¶ 41.)  Her CIWA score was recorded on her CIWA Worksheet and logged into the ADC's computerized medical records system.  (SLCo Stevenson 000207, -000202.)

39.    Around midnight on August 15, 2010, the nursing staff received a call about Ms. Goggin throwing up in her cell.  (SLCo Stevenson 000185.)

40.    Ms. Goggin was seen very shortly thereafter, i.e., at approximately 1:00 a.m., by another "triage nurse," Diane (Elizabeth) Hardy.  (*Id*.)  Nurse Hardy observed Ms. Goggin on her bunk "with [a] medium amount of vomit in the garbage can next to her."  (*Id*.)

41.    Nurse Hardy took Ms. Goggin's vital signs, which showed a slightly elevated

blood pressure (140/99) and heart rate (135).  Ms. Goggin told Nurse Hardy she was in "her third

day of withdrawing from heroin, and that these are normal symptoms for her when she

withdraws."  (*Id.*)

      42.    Nurse Hardy observed Ms. Goggin to be "alert & oriented x4 and cooperative."

(*Id.*)  She was advised to "stay well-hydrated (sips, not gulps), and to get some rest.  Inmate

verbalized understanding and had no further complaints at [that] time."  (*Id.*)

      43.    Records indicate that was Nurse Hardy's only medical interaction with Ms.

Goggin.  (Wilcox Decl. at ¶ 46.)

      44.    Ms. Goggin had also submitted a Sick Call Request Form early in the morning on

August 15, 2010.  She reported that she was "violently throwing up" and that her heart, although

better, still felt "faster than it should."  (SLCo Stevenson 000198.)

      45.    In response, Ms. Goggin was seen by another nurse at approximately 9:00 a.m. on

August 15, 2010.  Although her blood pressure was initially elevated, it dropped to 96/58 (with a

heart rate of 110) after she drank some Gatorade.  (SLCo Stevenson 000198; Wilcox Decl. at

¶ 48.)  The nurse placed Ms. Goggin's name on the Doctor Call List to be seen that day.  (SLCo

Stevenson 000198.)

      46.    Ms. Goggin's next regular CIWA assessment occurred at approximately 11:15

a.m. on August 15, 2010.  At that time, she was assessed with a CIWA score of five, with four

points assessed for nausea and, for the first time, one point assessed for anxiety.  (SLCo

Stevenson 000207.)  Her CIWA score was recorded on her CIWA Worksheet and logged into the

ADC's computerized medical records system.  (*Id.*; SLCo Stevenson 000200.)

      47.    Ms. Goggin's blood pressure and temperature were well within the range of

normal, i.e., blood pressure of 100/60 and temperature of 97.8, and her heart rate was elevated at 140.  (SLCo Stevenson 000207; Wilcox Decl. at ¶ 50.)  Ms. Goggin was again given Gatorade to ensure she remained properly hydrated.  (SLCo Stevenson 000207; Wilcox Decl. at ¶ 50.)

48.    Ms. Goggin saw the on-call doctor, Dr. Vinik, shortly thereafter.[6]  Dr. Vinik took her vital signs, which remained stable and were normal for a withdrawal patient, i.e., blood pressure of 96/58, heart rate 120, and temperature of 96.8.  (SLCo Stevenson 000140; Wilcox Decl. at ¶ 51.)

49.    Dr. Vinik observed, however, that she was "ill appearing" and had been "unable" to "keep down" her oral Phenergan medication.  (SLCo Stevenson 000140.)

50.    Dr. Vinik decided to admit Ms. Goggin to the Acute Medical Unit for a laboratory evaluation and, if necessary and advisable, administration of intravenous ("IV") fluids and medications (Zofran) to speed her recovery from her withdrawal.  (*Id*.)  He also prescribed Phenergan suppositories.  (*Id*.; *see also* SLCo Stevenson 000138; Wilcox Decl. at ¶ 53.)

51.    Phenergan suppositories are often prescribed at the ADC and other correctional facilities and hospitals nationwide when oral Phenergan has been ineffective or cannot be tolerated by the patient because of on-going vomiting.  (Wilcox Decl. at ¶ 54.)  Zofran is a stronger IV anti-nausea medication commonly given if Phenergan proves to be ineffective.  (*Id*.)

52.    It is important to obtain a complete blood count and basic metabolic panel at the beginning of any significant administration of IV fluids or medications to ensure the patient's electrolytes are within a safe range.  Making this determination is critical to selecting the proper

---

[6]  Although these records reflect the name "Eric Lindley, M.D.," his name appears due to a transcriptionist error.  (*See* Declaration of Eric Lindley (June 23, 2012), attached hereto as Exhibit 3, at ¶ 6.)

IV fluid to administer so that any abnormalities will be corrected and to avoid diluting out electrolytes by overusing the incorrect replacement fluid.  These tests also ensure the patient's kidneys are working properly and can safely handle the ordered fluid load.  (Wilcox Decl. at ¶ 55.)

53.     After her appointment with Dr. Vinik, which concluded at approximately 2:00 p.m., Ms. Goggin returned to her cell to wait while an order was placed to transport her to the Acute Medical Unit.  (SLCo Stevenson 000109.)

54.     After her doctor's appointment but prior to being transported to the Acute Medical Unit, Ms. Goggin vomited in her cell.  (*Id.*)

55.     Housing Officer Jeffrey Gonzales checked on her at 2:06 p.m., advised her to keep drinking the Gatorade and water, and to "get [his] attention if she needed anything."  (*Id.*)

56.     At approximately 2:40 p.m., Ms. Goggin's cellmate called the Control Room to say Ms. Goggin was having trouble breathing. (*Id.*; *see also* SLCo Stevenson 000107.)

57.     Housing Officer Gonzales again went to check on her.  (SLCo Stevenson 000109.)

58.     Ms. Goggin advised him she was already scheduled to be admitted into the Acute Medical Unit.  (SLCo Stevenson 000109.)

59.     Housing Officer Gonzales advised Ms. Goggin to sit up and breathe slowly, and to keep drinking liquids.  (*Id.*)

60.     Housing Officer Gonzales also called a nurse, who said she would "be in the unit next to see her."  (*Id.*)  The nurse in question was the same nurse who had seen Ms. Goggin earlier that day, at approximately 11:15 a.m.  (*See id.*; SLCo Stevenson 000200.)

61.     Prior to the nurse's arrival, however, M/CIRT[7] officers arrived to transport Ms. Goggin to the Acute Medical Unit.  (SLCo Stevenson 000109; *see also* SLCo Stevenson 000107.)

62.     Ms. Goggin was transported to the Acute Medical Unit.  She was placed in a room in the Acute Medical Unit at approximately 3:00 p.m.  (SLCo Stevenson 000114; Wilcox Decl. at ¶ 57.)

63.     At approximately 3:03 p.m., a nurse in the Acute Medical Unit observed that Ms. Goggin seemed to be in distress, and requested and obtained the keys to her room.  (SLCo Stevenson 000114.)  Within two minutes, by 3:05 p.m., the nurse called for Dr. Vinik (who was already in the Unit helping another inmate) and CPR was started.  (*Id.*; *see also* SLCo Stevenson 000117, -000123, -000184.)

64.     Records indicate that Nurse Julie (Evans) Carter was part of the team that treated Ms. Goggin in the Acute Medical Unit on August 15, 2010.  (Wilcox Decl. at ¶ 59.)  Records further indicate this was Nurse Carter's only medical interaction with Ms. Goggin.  (*Id.*)

65.     At approximately 3:07 p.m., ADC staff called for an ambulance and prepared to transport Ms. Goggin to the ambulance bay.  (SLCo Stevenson 000184.)

66.     Ms. Goggin was taken from the Acute Medical Unit at approximately 3:15 p.m. and the ambulance arrived by approximately 3:18 p.m.  (*Id.*)

67.     The ambulance arrived at St. Marks Hospital at approximately 3:36, and Ms. Goggin was declared dead at approximately 3:50 p.m.  (SLCo Stevenson 000123.)

68.     The laboratory findings and autopsy suggest Ms. Goggin was moderately volume

---

[7] M/CIRT stands for Movement and Critical Incident Response Team.

depleted and likely had an electrolyte imbalance that caused a sudden fatal arrhythmia.  (Wilcox Decl. at ¶ 63.)

69.     Chronic illicit drug use is known to be toxic to the human heart over time.  Ms. Goggin had findings on her autopsy that correlate with cardiac damage.  As such, her heart was at an increased risk for the development of an arrhythmia as a result of her drug use.  (Wilcox Decl. at ¶ 64.)

70.      Also consistent with the lab findings, physical examination findings, and witnesses' recollection of events would be a finding that Ms. Goggin suffered from early-stage Ogilvie's Syndrome.  Ogilvie's Syndrome can occur in high dose opiate users.  It is basically an opiate-induced ileus (lack of bowel motion that looks initially like a bowel obstruction but is due to lack of peristalsis rather than a kink in the bowel).  Although Ogilvie's Syndrome is not common, its symptoms in the early stages correlate to Ms. Goggin's physical condition, e.g., lack of absorption of orally ingested liquids, diarrhea, repetitive vomiting despite the administration of Phenergan, and potentially severe electrolyte abnormalities.  (Wilcox Decl. at ¶ 65.)

71.     The nurses and the mental health professional properly identified Ms. Goggin as at risk for withdrawal syndrome, as they were trained to do.  They appropriately entered the screening orders and conducted repetitive screenings during her stay in jail to assess her.  This is consistent with their training and meets the standard of care in correctional facilities nationally. (Wilcox Decl. at ¶ 66.)

72.     The nurses were diligent in helping Ms. Goggin maintain her fluid intake and in treating her nausea and vomiting.  Their constant provision of Gatorade, repetitive monitoring of heart rate to make sure the Gatorade was assisting, and obtaining a Phenergan prescription for

her were consistent with their training and met the standard of care for treating withdrawal patients in correctional facilities. (Wilcox Decl. at ¶ 67.)

73.     At no time did Ms. Goggin's CIWA score suggest she had significant withdrawal symptoms or severe dehydration that would require medical intervention. The nurses were diligent in documenting their findings and those findings were consistent throughout the patient's treatment. (Wilcox Decl. at ¶ 68.)

74.     Late in the evening on August 13, 2010, Nurse Smith appropriately contacted the on-call doctor to apprize him of Ms. Goggin's condition and obtain a prescription for oral Phenergan. This treatment meets the standard of care for treating withdrawal patients in correctional facilities nationally. (Wilcox Decl. at ¶ 69.)

75.     It is common for patients to have increased heart rates over the course of their withdrawal. The nurses appropriately monitored Ms. Goggin's heart rate and escalated Ms. Goggin's care as soon as her heart rate increased over her baseline and was not responsive to oral fluids. This is consistent with their training and meets the standard of care for assessing and treating withdrawal patients in correctional facilities nationally. (Wilcox Decl. at ¶ 70.)

76.     On the morning of August 15, 2010, a nurse added Ms. Goggin's name to the Doctor Call List to be seen that day because he was concerned about her vomiting and increased heart rate over her baseline. This meets the standard of care for treating withdrawal patients in correctional facilities nationally. (Wilcox Decl. at ¶ 71.)

77.     Dr. Vinik saw Ms. Goggin that day, assessed her clinically, and decided to admit her to the Acute Medical Unit for laboratory testing and, if necessary and advisable, administration of IV fluids and medications. This treatment meets the standard of care and is

exactly what would have been done in the emergency room of any hospital.  (Wilcox Decl. at ¶ 72.)

78.     Because the ADC has a laboratory on-site, obtaining Ms. Goggin's laboratory results and starting appropriate IV fluids and medications would have been faster than if she had been transported to a hospital.  The decision to keep her at the ADC for laboratory assessment and, if necessary and advisable, administration of IV fluids and medications met the standard of care and, indeed, would have accomplished that care faster.  (Wilcox Decl. at ¶ 73.)

79.     Given the multiple extensive encounters Ms. Goggin had with nursing, mental health, doctor, and Housing Unit Officers, there is no evidence of deliberate indifference to her serious medical needs.  (Wilcox Decl. at ¶ 74.)

80.     To the contrary, Defendants and others at all times monitored, assessed, and treated Ms. Goggin utilizing their best clinical judgment and consistent with all applicable standards of care.  (Wilcox Decl. at ¶ 75.)

**2.     Count Two:  Claim for "Failure to Train and/or Supervise" under the Eighth Amendment of the United States Constitution (against Salt Lake County, Sheriff Winder, Wellcon, Inc., and Wellcon, LLC).**

**A.     Statement of Elements**

1.     Salt Lake County

A municipality can never be held "liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood,* 997 F.2d 774, 782 (10th Cir. 1993).  When an officer deprives a citizen of a constitutional right, however, municipal governments may incur liability under 42 U.S.C. section 1983 when the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation,

or decision officially adopted and promulgated by that body's officers. *See Monell v. Dep't of Social Services,* 436 U.S. 658, 694 (1978).

In the absence of an explicit policy or an entrenched custom, the purported inadequacy of training may serve as the basis for municipal liability only where the "failure to train" amounts to deliberate indifference to the rights of persons with whom the State actor might come into contact. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under section 1983. *Id.* at 389; *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("[T]he failure to train must reflect[ ] a deliberate or conscious choice by a municipality.") (citations and internal quotation marks omitted).

2. <u>Supervisory Defendants</u>

As to the individual Defendants named in this cause of action—i.e., Sheriff Winder, Former Chief Cook, and Wellcon—"there is no concept of strict supervisor liability under [section] 1983." *Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir. 1996) (citing *Ruark v. Solano*, 928 F.2d 947, 950 (10th Cir. 1991); *see also Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) ("Liability . . . must be based upon more than a mere right to control employees and cannot be based on simple negligence.").

There also is no supervisor liability based on "mere negligence." *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997). Instead, to establish supervisor liability under section 1983, "the plaintiff must establish 'a deliberate, intentional act by the supervisor to violate constitutional rights.'" *Jenkins*, 81 F.3d at 994-95 (quoting *Woodward v. City of Worland*, 977

20

F.2d 1392, 1399 (10th Cir. 1992)).  Supervisory defendants thus may be held liable for the alleged unconstitutional acts of their subordinates only if they actively participated or acquiesced in the constitutional violation.  *See Winters v. Board of County Comm'rs,* 4 F.3d 848, 855 (10th Cir. 1993); *Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir. 1990) ("For supervisory liability [in a [section] 1983 action], plaintiffs must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation.").

In specific regard to an alleged "failure to train," a "lack of training claim fails without proof that [the supervisor] made a conscious decision to adopt a policy of not training or accepted a permanent and well-settled practice of not training."  *Boyett v. Cty. of Wash.*, 2006 W.L. 3422104, at *23 (D. Utah Nov. 28, 2006) (Cassell, J.) (unpublished) (citing *Simmons v. City of Phila.*, 947 F.2d 1042, 1059 (3d Cir. 1991); *Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985).  Indeed, "[a] supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988); *but see Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 768 (10th Cir. 2013) (questioning whether, post-*Iqbal*, which articulated a stricter liability standard, the *Meade* standard is still good law, but declining to decide the question).

In specific regard to an alleged "failure to supervise," "liability for failure to supervise or correct misconduct requires, among other things, that the defendant be 'adequately put on notice

of the prior misbehavior.'"  *Boyett*, 2006 WL 2422104, at *23 (quoting *McClelland v. Facteau*,

610 F.2d 693, 697 (10th Cir. 1979)).  Whether a supervisor is found to have had the requisite

"notice" is evaluated using the standard of a reasonable person under the circumstances.

*McClelland*, 610 F.2d at 697.  Only when such "notice" has been established can there be a

supervisory duty (if any) to take affirmative steps to prevent violation of potential plaintiffs'

rights.  *Id.* at 698.

   **B.**  **Undisputed Material Facts**

    In addition to the undisputed material facts set forth in response to Count One, supra at

pp. 5-19, the following facts are relevant here:

    81.  There is no evidence in this case that the County or the supervisory defendants (or

any of them) adopted a policy of not training, or accepted a permanent and well-settled practice

of not training, ADC medical or mental health personnel.

    82.  To the contrary, training of the nurses, mental health professional, and doctors

resulted in Ms. Goggin timely and appropriately being identified as at risk for withdrawal

syndrome.  (Wilcox Decl. at ¶ 66.)

    83.  Training of the nurses, mental health professional, and doctors also resulted in

screening orders and repetitive screenings to assess Ms. Goggin and to help her maintain her

fluid intake while treating her nausea and vomiting.  (*Id*. at ¶¶ 66-67.)

    84.  Training of the nurses and doctors also resulted in repetitive monitoring of Ms.

Goggin's heart rate and other vital signs, and the escalation of Ms. Goggin's care as soon as her

heart rate increased over her baseline and was not responsive to oral fluids.  (*Id*. at ¶¶ 67-70.)

85.     There is also no evidence that the County or the supervisory defendants (or any of them) were "adequately put on notice" of any actual training deficiencies—which did not exist— or that they nonetheless failed to correct them.

**3.     Count Three:  Claim for "Unlawful Custom, Policy, or Practice" under the Eighth Amendment of the United States Constitution.**

**A.     Statement of Elements**

A municipality can never be held "liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers." *Hinton*, 997 F.2d at 782.  When an officer deprives a citizen of a constitutional right, however, municipal governments may incur liability under section 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  "It is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under [section] 1983."  *Canton,* 489 U.S. at 385 (internal citation and quotation marks omitted).

**B.     Undisputed Material Facts**

In addition to the undisputed material facts set forth in response to Counts One, supra at pp. 5-19, and Two, supra at pp. 22-23, the following facts are relevant here:

86.     There is no evidence in this case that any custom, policy, or practice of Salt Lake County (or any other entity) contributed to, let alone caused, Ms. Goggin's death.

87.     To the contrary, the policies followed by the nurses, mental health professional, doctors, and others resulted in Ms. Goggin timely and appropriately being identified as at risk for withdrawal syndrome.   (Wilcox Decl. at ¶ 66; SLCo Stevenson 000342-000355.)

88.    The policies followed by the nurses, mental health professional, doctors, and others also resulted in screening orders and repetitive screenings to assess Ms. Goggin and to help her maintain her fluid intake while treating her nausea and vomiting.  (Wilcox Decl. at ¶¶ 66-67; SLCo Stevenson 000207, -000342-000358.)

89.    The policies followed by the nurses and doctors also resulted in repetitive monitoring of Ms. Goggin's heart rate and other vital signs, and escalation of Ms. Goggin's care as soon as her heart rate increased over her baseline and was not responsive to oral fluids.  (*Id.* at ¶¶ 67-70; SLCo Stevenson 000207, -000342-000358.)

**4.    Count Four:  Claim for Cruel and Unusual Punishment and "Unnecessary Rigor" under Article 1, Section 9 of the Utah State Constitution.**

**A.    Statement of Elements**

An inmate may not recover damages under article I, section 9 of the Utah State Constitution unless he shows that his injury was caused by a prison employee who acted with deliberate indifference or inflicted unnecessary abuse upon him.  *Bott v. DeLand*, 922 P.2d 732, 740 (Utah 1996), *abrogated on other grounds by Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 16 P. 3d 533 (Utah 2000).

The deliberate indifference standard differentiates between inadvertent misconduct, which does not give rise to liability, and the "unnecessary and wanton infliction of pain," which does.  *Estelle,* 429 U.S. at 105.  As the Utah Supreme Court has explained (*Bott*, 922 P.2d at 740):

> For example, a physician who is guilty of medical malpractice is not guilty of a constitutional violation "merely because the victim is a prisoner." [*Estelle*, 429 U.S.] at 106; *El'Amin v. Pearce,* 750 F.2d 829, 832 (10th Cir. 1984); *Brown v. Schiff,* 614 F.2d 237, 239 (10th Cir. 1980).  Similarly, a prison worker's inadvertent failure to provide adequate medical care would not support a

constitutional claim for damages.  *Estelle,* 429 U.S. at 105; *Olson v. Stotts,* 9 F.3d 1475, 1476–77 (10th Cir. 1993); *Daniels v. Gilbreath,* 668 F.2d 477, 488 (10th Cir. 1982)

"Unlike the deliberate indifference standard, the unnecessary abuse standard has not been widely explored." *Bott*, 922 P.2d at 740.  Under this standard, the main consideration is "whether a particular prison or police practice would be recognized as an abuse to the extent that it cannot be justified by necessity."  *Id.* (quoting *Sterling v. Cupp*, 625 P.2d 123, 130 (Or. 1981)).  The definition of "abuse" focuses on "needlessly harsh, degrading, or dehumanizing" treatment of prisoners. *Id.* (quoting *Sterling*, 625 P.2d at 131).

Finally, to recover monetary damages for an alleged violation of Ms. Goggin's constitutional rights, the plaintiff here must establish, among other things, that Ms. Goggin suffered a "flagrant" violation of her constitutional rights.  *Dexter v. Bosko*, 184 P.3d 592, 597-98 (Utah 2008).  The flagrant violation element, "ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [himself] liable for a constitutional violation."  *Id.* at 598.

### B.    Undisputed Material Facts

The undisputed material facts relevant to this claim are set forth in response to Count One, supra at pp. 5-19.

## 5.    Affirmative Defense of Qualified Immunity

### A.    Statement of Elements

The affirmative defense of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Government officials are entitled to qualified immunity "in all but the most exceptional cases."  *Boyett v.*

*Washington County*, 2006 WL 3422104 , at *14 (D. Utah Nov. 28, 2006) (Cassell, J.)

(unpublished) (citing *Tonkovic v. Kan. Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998)).

Once a defendant invokes the affirmative defense of qualified immunity, the plaintiff

must satisfy a two-part test.  *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000).  As part of

this "heavy two-part burden," *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995), the

plaintiff must first establish the defendant's acts or omissions violated a constitutional or

statutory right.  *Id.*; *see also Siegert v. Gilley,* 500 U.S. 226, 232 (1991) ("A necessary

concomitant to the determination of whether the constitutional right asserted by a plaintiff is

'clearly established' . . . is the determination of whether the plaintiff has asserted a violation of a

constitutional right at all.").

Next, the plaintiff must show the right at issue was clearly established at the time of the

defendant's unlawful conduct.  *Id.*  "In assessing whether a right was clearly established, the

court must look at the objective legal reasonableness at the time of the challenged action and ask

if 'the right [was] sufficiently clear that a reasonable officer would understand that what he [was]

doing violate[d] that right.'" *Boyett*, 2006 WL 3422104, at *14 (quoting *Wilson v. Layne*, 526

U.S. 603, 615 (1999)).  "The right allegedly violated must be defined at the appropriate level of

specificity before a court can determine if it was clearly established."  *Wilson*, 526 U.S. at 615.

If the plaintiff fails to satisfy any part of that inquiry, the court must grant qualified

immunity to the individually named defendants.

### B.    Undisputed Material Facts

In addition to the undisputed material facts set forth in response to Count One, *supra* at

pp. 5-19, the following facts are relevant here:

90.     Dr. Wilcox did not personally know or treat Ms. Goggin while she was incarcerated at the ADC.  (Wilcox Decl. at ¶ 5.)

91.     Neither Sheriff Winder nor Former Chief Cook is a medical professional. (Declaration of Chief Deputy and Jail Commander Pamela Lofgreen (Jan. 31, 2014), attached hereto as Exhibit 4, at ¶ 3.)

92.     Neither Sheriff Winder nor Former Chief Cook met Ms. Goggin, or were directly involved in her medical treatment, while she was incarcerated at the ADC.  (*Id*. at ¶ 4.)

**6.     Claim for Punitive Damages (against all Defendants).**

**A.     Statement of Elements**

Punitive damages may not be awarded against the County.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[W]e hold that a municipality is immune from punitive damages under 42 U.S.C. [section] 1983."); *Ray v. City of Edmond*, 662 F.2d 679, 680 (10th Cir. 1981) (applying *City of Newport* to reverse award of punitive damages against municipality).

As against the other named defendants, punitive damages may be awarded only if their "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983). *see also id.* ("We further hold that this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness.").

**B.      Undisputed Material Facts**

In addition to the undisputed material facts set forth in response to Counts One, supra at pp. 5-19, Two, supra at pp. 22-23, and Three, supra at pp. 23-24, the following facts are relevant here:

93.      There is no evidence, nor can there be, that any of the individually named defendants were motivated by "evil motive or intent" or "callous indifference."

94.      To the contrary, all of the individually named defendants at all times monitored, assessed, and treated Ms. Goggin utilizing their best clinical judgment and consistent with all applicable standards of care.  (Wilcox Decl. at ¶¶ 66-75.)

**ARGUMENT**

**1.      The Individually Named Defendants, and Each of Them, are Entitled to Qualified Immunity.**

Defendants Sheriff Winder, Former Chief Cook, and Nurses Smith, Hardy, and Evans, as well as Doctors Vinik and Wilcox, are entitled to qualified immunity to the extent they are sued in their individual capacities.

Once an individually named defendant invokes the affirmative defense of qualified immunity, the plaintiff must satisfy a two-part test.  *Scull v. New Mexico*, 236 F.3d 588, 595 (10th Cir. 2000).  As part of this "heavy two-part burden," *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995), the plaintiff must first establish the defendant's acts or omissions violated a constitutional or statutory right.  *Id.*   Here, the "constitutional or statutory right" at issue is Ms. Goggin's Eighth Amendment right to be free from cruel and unusual punishment.  To establish that such a right was "violated," Plaintiff would need to show that Defendants were "deliberate[ly] indifferen[t] to the serious medical needs" of Ms. Goggin.  *See Estelle v. Gamble,*

429 U.S. 97, 104 (1976).  To show "the requisite deliberate indifference," she must demonstrate

that the "need" was "sufficiently serious," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), and

also that "the official [was] both [] aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference," *id.* at 837.   "If an

official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that

harm, he bears no liability under this standard." *Despain v. Uphoff*, 264 F.3d 965, 975 (10th Cir.

2001) (citing *Farmer*, 511 U.S. at 844; *MacKay v. Farnsworth,* 48 F.3d 491, 493 (10th Cir.

1995)).

 To satisfy the second part of Plaintiff's "heavy two-part burden," *Albright*, 51 F.3d at

1534, she must show the right at issue was clearly established at the time of the defendant's

unlawful conduct.[8]  *Id.*  "In assessing whether a right was clearly established, the court must look

at the objective legal reasonableness at the time of the challenged action and ask if 'the right

[was] sufficiently clear that a reasonable officer would understand that what he [was] doing

violate[d] that right.'" *Boyett v. Washington County*, 2006 WL 3422104 , at *14 (D. Utah Nov.

28, 2006) (Cassell, J.) (unpublished)[9] (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

---

[8]  Defendants contend the specific "right" at issue, i.e., to receive intravenous fluids and
medication while withdrawing from drugs or alcohol despite having low CIWA scores and vital
signs in the normal range, is not "clearly established" for purposes of qualified immunity.
Because no defendant in this case was "deliberately indifferent" to Ms. Goggin's serious medical
needs, however, *see* discussion infra at pp. 30-36, it is not necessary for this Court to decide
whether the specific "right" alleged by Plaintiff  was "clearly established."  *See generally
Pearson v. Callahan*, 555 U.S. 223 (2009) (holding that, if plaintiff fails either part of the two-
part qualified immunity test, no further analysis is required).

[9] The qualified immunity discussion in *Boyett* is particularly instructive here.  There, as here,
each of the individually named defendants had only limited interactions with the allegedly
injured individual, Mr. Boyett.  And there, as here, each individually named defendant treated
Mr. Boyett appropriately for the complaints or symptoms presented at the relevant times.
Accordingly, each of the individually named defendants was granted qualified immunity.  *See*

"The right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson*, 526 U.S. at 615.

If Plaintiff fails to satisfy any part of that two-part inquiry, this Court must grant qualified immunity to the individually named defendants in this case.

### A.    The Nurse Defendants Were Never Deliberately Indifferent to Ms. Goggin's Serious Medical Needs.

Each of the named Nurse Defendants had only one contact with Ms. Goggin during the course of her short time at the ADC.  Far from demonstrating "deliberate indifference," each Nurse Defendant acted reasonably in assessing and responding to Ms. Goggin's condition and complaints, and thus is entitled to qualified immunity.

### 1.    Nurse Kristyn Smith (Undisputed Facts Nos. 29-35)

Nurse Smith responded as a "triage nurse" to Ms. Goggin's cell in the late evening of August 13, 2010.  Nurse Smith checked Ms. Goggin's vital signs, all of which were in the range of normal for a withdrawal patient.  In an abundance of caution, and in light of Ms. Goggin's report of chest pains, Nurse Smith telephoned the on-call doctor, Dr. Vinik, to advise him of Ms. Goggin's complaints and, on Dr. Vinik's orders, filled a prescription for Ms. Goggin of oral Phenergan[10] to be taken twice daily for the next three days.  That was Nurse Smith's only medical interaction with Ms. Goggin.

Based on this evidence, no reasonable jury could find that Nurse Smith was deliberately indifferent to Ms. Goggin's serious medical needs.  Nurse Smith saw Ms. Goggin only once,

---

*generally Boyett*, 2006 WL 3422107, at \*16-\*21.

[10]  Phenergan is an effective anti-nausea medication often prescribed at the ADC and other correctional facilities and hospitals nationwide to treat patients who are experiencing nausea and vomiting.

examined and assessed her appropriately, and thereafter consulted with the on-call doctor to

obtain (and did obtain) a prescription to treat Ms. Goggin's reported nausea and vomiting.

Moreover, at that time, Ms. Goggin's symptoms—far from evidencing an emergency or any

"sufficiently substantial danger," *Farmer*, 511 U.S. at 844—were entirely consistent with

patients undergoing withdrawal from alcohol or drugs.

Nurse Smith acted reasonably to avoid or alleviate any potential harm to Ms. Goggin, and

thus is entitled to qualified immunity on this claim. *Despain*, 264 F.3d at 975; *see generally*

*Boyett*, 2006 WL 3422107, at *16-*21.

2.   <u>Nurse Diane (Elizabeth Hardy) (Undisputed Facts No. 40-43)</u>

Like Nurse Smith, Nurse Hardy interacted with Ms. Goggin only once, when she

responded as a "triage nurse" in response to a call about Ms. Goggin throwing up in her cell.

Also like Nurse Smith, Nurse Hardy checked Ms. Goggin's vital signs, which were slightly

elevated but not uncommon for a withdrawal patient.  Moreover, Ms. Goggin explicitly advised

Nurse Hardy that she had withdrawn from heroin before and "these were <u>normal symptoms for

her when she withdraws</u>."  (Emphasis added.)  Based on that representation and Ms. Goggin's

vital signs and alert appearance, Nurse Hardy appropriately advised Ms. Goggin to "stay well-

hydrated (sips, not gulps), and to get some rest."  Nurse Hardy also recorded in her notes,

"[i]nmate verbalized understanding and had no further complaints at [that] time."

As before with Nurse Smith, Ms. Goggin did not at that time have symptoms that

evidenced a "sufficiently substantial danger," *Farmer*, 511 U.S. at 844; instead, her symptoms,

both observed and reported, were entirely consistent with any withdrawal patient and, equally

31

important, consistent with Ms. Goggin's own self-reported past experiences with heroin withdrawal.

No reasonable jury could conclude that Nurse Hardy was deliberately indifferent to Ms. Goggin's serious medical needs.  Nurse Hardy is entitled to qualified immunity.

   3. <u>Nurse Julie (Evans) Carter (Undisputed Facts Nos. 62-66)</u>

Records indicate Nurse Carter was part of the team that briefly treated Ms. Goggin in the Acute Medical Unit on August 15, 2010, before she was transported to the hospital.  That was Nurse Carter's only medical interaction with Ms. Goggin.

Ms. Goggin was in the Acute Medical Unit for less than three minutes before she became distressed, and was there less than two minutes more before the full team was assembled and CPR began.  There is no evidence whatsoever that Nurse Carter was deliberately indifferent to Ms. Goggin's serious medical needs that day (or ever), or that she, in particular, did not take "reasonable measures to avoid or alleviate" any perceived harm to Ms. Goggin after she arrived in the Acute Medical Unit.

Nurse Carter is entitled to qualified immunity.

 **B.** **The Individually Named Wellcon Employees Were Never Deliberately Indifferent to Ms. Goggin's Serious Medical Needs.**

   1. <u>Dr. Todd Wilcox, M.D. (Undisputed Fact No. 90)</u>

Dr. Wilcox did not himself treat Ms. Goggin, and thus had no opportunity to become "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed in Ms. Goggin's case, let alone to actually "draw the inference," *Farmer*, 511 U.S. at 837.  There is no evidence, nor can there be, that he should be liable, individually or otherwise,

for any alleged violation of Ms. Goggin's constitutional rights.  Dr. Wilcox is entitled to

qualified immunity.

        2.     <u>Dr. Russell Vinik, M.D. (Undisputed Facts Nos. 32-34, 48-52, 63-67,</u>
            <u>77-78)</u>

Ms. Goggin's treating physician, Dr. Vinik, is also entitled to qualified immunity, as

there is no evidence that he was deliberately indifferent to Ms. Goggin's serious medical needs.

Dr. Vinik was involved on three separate occasions with Ms. Goggin's medical

assessment and treatment while she was incarcerated at the ADC.  As discussed more fully

below, each time, Dr. Vinik assessed Ms. Goggin's condition and complaints and undertook

"reasonable efforts to avoid or alleviate" any perceived harm to her.  *Despain*, 264 F.3d at 975.

While the prescribed treatments were ultimately unsuccessful, it is not enough for Plaintiff to

allege, with the benefit of hindsight, that Dr. Vinik may have failed "to alleviate a significant risk

that [he] should have perceived but did not."  *Farmer*, 511 U.S. at 838; *Estelle*, 429 U.S. at 105-

06 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an

unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'").

Instead, to establish a constitutional violation, the plaintiff must show that Dr. Vinik actually

"[knew] of and disregard[ed] an excessive risk to [Ms. Goggin's] health or safety."  *Sealock v.*

*Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

Dr. Vinik was first advised of Ms. Goggin's condition and complaints by telephone call

from Nurse Smith late at night on August 13, 2010.  Although Nurse Smith checked Ms.

Goggin's vital signs and found them all to be in the range of normal for a withdrawal patient, in

an abundance of caution she contacted Dr. Vinik (the on-call doctor) to discuss the case with

him.  Based on Nurse Smith's assessment and observations, Dr. Vinik prescribed Ms. Goggin

with oral Phenergan, a medication widely used and known to be effective in treating patients

with nausea and vomiting.  Given Ms. Goggin's condition at that time, which in no way

evidenced a "sufficiently substantial danger," *Farmer*, 511 U.S. at 844, no reasonable jury could

find that Dr. Vinik did not take "reasonable efforts to avoid or alleviate" any perceived risk to

her.  *Despain*, 264 F.3d at 975.

  The same is true with Dr. Vinik's visit with Ms. Goggin on August 15, 2010, which

occurred within hours of her submitting a Sick Call Request Form, being evaluated by a nurse,

and being placed on the Doctor Call List.  Dr. Vinik took her vital signs, which remained stable

and were normal for a withdrawal patient, i.e., blood pressure of 96/58, heart rate 120, and

temperature of 96.8.  He observed, however, that she was "ill-appearing" and that she reported

being unable to "keep down" her Phenergan oral medication.  Accordingly, he decided to admit

Ms. Goggin to the Acute Medical Unit for a laboratory evaluation[11] and, if necessary and

advisable, administration of intravenous ("IV") fluids and medications (specifically Zofran[12]) to

speed her recovery.  He also prescribed Phenergan suppositories.[13]  It simply cannot reasonably

be argued, and no reasonable juror could find, that Dr. Vinik failed to make "reasonable efforts"

---

[11] It is important to obtain a complete blood count and basic metabolic panel at the beginning of any significant administration of IV fluids or medications to ensure the patient's electrolytes are within a safe range.  Making this determination is critical to selecting the proper IV fluid to administer so that any abnormalities will be corrected and to avoid diluting out electrolytes by overusing the incorrect replacement fluid.  These tests also ensure the patient's kidneys are working properly and can safely handle the ordered fluid load.

[12] Zofran is a stronger IV anti-nausea medication commonly given if Phenergan proves to be ineffective.

[13] Phenergan suppositories are often prescribed at the ADC and other correctional facilities and hospitals nationwide when oral Phenergan has been ineffective or cannot be tolerated by the patient because of on-going vomiting.

to treat Ms. Goggin, *id.*, or that he "[knew] of and disregard[ed] an excessive risk to [Ms. Goggin's] health or safety," *Sealock*, 218 F.3d at 1209.

Finally, within an hour of her visit with Dr. Vinik, i.e., by no later than 3:00 p.m., Ms. Goggin was transported to and arrived in the Acute Medical Unit. Within mere minutes, Ms. Goggin became distressed and a full team of professionals, including Dr. Vinik, assembled to treat her. Unfortunately, their efforts (and those of the EMTs and doctors at St. Marks) were unsuccessful; she was pronounced dead at the hospital approximately 50 minutes later. Regardless of that unfortunate outcome, there is no evidence that Dr. Vinik was deliberately indifferent to Ms. Goggin's serious medical needs in the Acute Medical Unit, or that he, in particular, did not take "reasonable efforts to avoid or alleviate" any perceived harm to Ms. Goggin after she arrived.

With the benefit of hindsight, Plaintiff now alleges Dr. Vinik might have ordered different treatments or ordered them earlier. But that is not the standard to find a constitutional violation. The cases are clear that "[n]o Eighth Amendment violation can arise from a situation where 'a doctor merely exercises his considered medical judgment' and 'resolves the question whether additional diagnostic techniques or forms of treatment' are required." *Boyett v. Cty. of Wash.*, 282 Fed. Appx. 667 (10th Cir. 2008) (unpublished) (quoting *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)). Similarly, "an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." *Estelle*, 429 U.S. at 105-06; *see also Farmer*, 511 U.S. at 837.

Based on the record evidence, no reasonable jury could find the standard for section 1983 liability satisfied in this case. Dr. Vinik is entitled to qualified immunity.

### C.    Neither Sheriff Winder Nor Chief Cook Was Ever Deliberately Indifferent to Ms. Goggin's Serious Medical Needs (Undisputed Facts Nos. 91-92)

Neither Sheriff Winder nor Former Chief Cook was involved in Ms. Goggin's medical care, nor—as non-medical professionals—should they have been.  There is no evidence whatsoever that either of them had any connection, direct or otherwise, to the alleged constitutional violation at issue, let alone that they, themselves, were "deliberately indifferent" to Ms. Goggin's serious medical needs.  Both are entitled to qualified immunity.  *See Boyett*, 2006 WL 3422107, at *20 (finding qualified immunity for named defendant where there was no record evidence "as to what, if any, direct contact [he had] with" the injured party).

### 2.    Defendants are Entitled to Judgment as a Matter of Law on Plaintiff's Claims for "Cruel and Unusual Punishment" Under the United States Constitution.

As discussed previously, supra at pp. 28-29, Plaintiff may recover in this case for the alleged "cruel and unusual punishment" of Ms. Goggin only if Defendants were "deliberate[ly] indifferen[t] to the serious medical needs" of Ms. Goggin.  *See Estelle*, 429 U.S. at 104.  The test for "deliberate indifference" under the Eighth Amendment has "both an objective and a subjective component."  *Sealock*, 218 F.3d at 1209.   The objective component is met if the harm suffered is "sufficiently serious" to implicate the Cruel and Unusual Punishment Clause.  *See Farmer*, 511 U.S. at 834.  The subjective component "is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'"  *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S. at 837).  It is not enough to allege that prison officials failed "to alleviate a significant risk that [they] should have perceived but did not."  *Farmer*, 511 U.S. at 838; *see also Estelle*, 429 U.S. at 105-06 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the

conscience of mankind.'").

Also as discussed previously, no reasonable juror could find that any individually named defendant was deliberately indifferent to the serious medical needs of Ms. Goggin. *See* discussion supra at pp. 30-36. Indeed, Defendants, individually or as a whole, were not even close to the required standard of "deliberate indifference" in this case. The undisputed facts show Ms. Goggin: (i) was screened by three separate health care professionals when she was being booked into the ADC on August 11, 2010; (ii) was monitored at least twice daily between August 12 and August 15, 2010, to ensure her CIWA scores and vital signs were consistent both with withdrawal patients generally and with Ms. Goggin's own baseline (which they were); (iii) was promptly assessed and treated by nursing professionals (with doctor consultation as necessary) when she submitted a Sick Call Request Form or was reported to be vomiting in her cell; (iv) was timely and consistently provided with electrolyte replacement fluids (Gatorade[14]) to assist with proper hydration; (v) was prescribed and given oral Phenergan to treat her nausea and vomiting; and (vi) was referred to the Doctor Call List, and then transferred to the Acute Medical Unit, once her heart rate increased over her baseline and was not responsive to oral fluids.

Based on the records of extensive interactions by Ms. Goggin with medical personnel, as well as their documented efforts to treat Ms. Goggin's observed condition and reported complaints, no reasonable juror could conclude that these defendants, or any of them, were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[ew] the inference," *Farmer*, 511 U. S. at 837, but nonetheless

---

[14] The use of Gatorade in a correctional facility is rare; most facilities use only water, which is not nearly as effective. But Gatorade or other electrolyte replacement fluids are commonly prescribed at the ADC to assist with rehydrating patients who experience nausea and vomiting.

deliberately disregarded it, *Sealock*, 218 F.3d at 1209.  *Cf. also*, *Despain*, 264 F.3d at 975 ("If an

official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that

harm, he bears no liability under this standard.").

In this regard, the Court's decision in *Boyett* is particularly helpful.  There, plaintiffs

sought to hold Washington County liable for what they alleged was constitutionally deficient

medical treatment of Mr. Boyett by jail staff.  *See Boyett*, 2006 WL 3422104, at *25-*33.

Although the plaintiffs in *Boyett* generally "cite[d] 'reasonable medical standards of care' and

allege[d] employees of Washington County violated those standards," *id.* at *30, the Court found

"it [was] clear—as it is here with Ms. Goggin—that Mr. Boyett "received extensive medical

care and jail officials were not indifferent to his needs."  That was so despite the plaintiffs'

argument—as Plaintiff in this case also suggests—that, despite the provision of treatment, the

extent and timeliness of those treatments should have been different.  *Id.*  In response, the *Boyett*

Court held:

> The plaintiff has not shown the jail officials' treatment modalities violated Mr.
> Boyett's constitutional rights. Instead, the plaintiff's claims sound in negligence—
> a standard that does not give rise to municipal § 1983 liability. . . .  [I]t is clear
> Mr. Boyett received extensive medical care and jail officials were not indifferent
> to his needs.  . . .  [E]ven if all the plaintiff's "if only"[15] claims were meritorious,
> failure of correctional staff to follow the plaintiff's recommended courses of
> action does not constitute a civil rights violation—there is simply no evidence any
> defendants drew inferences that Mr. Boyett suffered from untreated serious
> medical conditions.  Therefore, the plaintiff's claim Washington County
> maintained unconstitutional customs of not treating medical needs does not
> survive summary judgment.

---

[15]  By "if only" claims, the Court was referring to the plaintiffs' unsupported suppositions that "if
only" jail staff had done X, then maybe the outcome would have been different.  *Boyett*, 2006
WL 3422104, at *23

*Boyett*, 2006 WL 3422104, at *30 (internal citations omitted); *cf. also id.* at *29 ("Moreover, the evidence fails to support an inference jail officials failed to treat any complaints or medical conditions of which they were aware.  In fact, jail officials appear to have taken particular care to address any complaints of which they had knowledge.").

Based on the undisputed facts in this case, no reasonable juror could find that Defendants, or any of them, were deliberately indifferent to Ms. Goggin's serious medical needs. Accordingly, Defendants are entitled to judgment as a matter of law on this claim.

**3.     Plaintiff Has Not—and Cannot—Establish That Any Alleged Violation of Ms. Goggin's Constitutional Rights Was the Result of a Policy, Practice, or Custom of Salt Lake County.**

In regard to Salt Lake County, a municipality can never be held "liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood,* 997 F.2d 774, 782 (10th Cir. 1993). Here, because there was no constitutional violation by any of the individually named defendants or any other officer or employee of Salt Lake County, the County, as a matter of law, is not liable.

Even if a constitutional violation had been established—which it has not—municipal governments incur liability under 42 U.S.C. section 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978); *see also City of Springfield v. Kibbe*, 480 U.S. 257, 267 (1987) ("The Court repeatedly has stressed the need to find a direct causal connection between municipal conduct and the constitutional deprivation.").  Moreover, where the identified policy—if any—is constitutional on its face, "considerably more proof than [a] single incident

will be necessary . . . to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985) (footnotes omitted).

Here, there is no evidence of any policy, practice, or custom of the County that negatively affected the care and treatment received by Ms. Goggin while she was incarcerated at the ADC.[16] To the contrary, the policies followed by the nurses, mental health professional, doctor, and others resulted in Ms. Goggin timely and appropriately being identified as at risk for withdrawal syndrome.   The policies followed by the nurses, mental health professional, doctors, and others also resulted in screening orders and repetitive screenings to assess Ms. Goggin and to help her maintain her fluid intake while treating her nausea and vomiting, as well as prompt responses by them to each request from her for assistance.  And the policies followed by the nurses, mental health professional, doctor, and others also resulted in repetitive monitoring of Ms. Goggin's heart rate and other vital signs, and the escalation of Ms. Goggin's care as soon as her heart rate increased over her baseline and was not responsive to oral fluids.

Because there is no evidence—nor can there be—that any policy, practice, or custom of the County negatively affected Ms. Goggin's care and treatment, let alone that such a policy or practice was directly causally connected to the alleged constitutional violation, Defendants are entitled to judgment as a matter of law on this cause of action.

---

[16]  The only "policy" alleged by Plaintiff in her unsworn complaint is "Laxity."  As the record amply establishes, Defendants were far from "lax" in their diligent and repetitive monitoring of Ms. Goggin during her brief time at the ADC.

**4.      Plaintiff Has Not—and Cannot—Establish That Any Alleged Violation of Ms. Goggin's Constitutional Rights Was the Result of a "Failure to Train" or "Supervise."**

    A.      <u>Because There Was No Violation of Ms. Goggin's Constitutional Rights, There Is No Municipal or Supervisory Liability In This Case</u>

As above, in regard to Salt Lake County, a municipality can never be held "liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers." *Hinton*, 997 F.2d at 782.  Here, because there was no constitutional violation by any of the individually named defendants or any other officer or employee of Salt Lake County, the County, as a matter of law, is not liable.  The same is true for the individual defendants named in this cause of action—i.e., Sheriff Winder, Former Chief Cook, and Wellcon.[17]  *See Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) (holding that supervisory liability, if any, is necessarily premised on a finding that the supervisor's subordinates violated the Constitution).

    B.      <u>As a Matter of Law, the County Is Not Liable For "Failure to Train" or "Supervise"</u>

Even if a constitutional violation had been established—which it has not—municipal governments incur liability under 42 U.S.C. section 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy, statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  Where, as here, there is no unconstitutional policy, practice, or custom, *see* discussion supra at pp. 39-40, the purported inadequacy of training may serve as the basis for municipal liability where the

---

[17]  *Boyett* is again instructive.  As the *Boyett* Court noted, 2006 WL 3422104, at *22, "The plaintiff's claim against the Sheriff fails at the outset because the plaintiff has not established any of Sheriff's Smith's subordinates violated Mr. Boyett's constitutional rights.  Without such a showing, the court cannot find Sheriff Smith was involved in any violation."

"failure to train" amounts to deliberate indifference to the rights of persons with whom the State actor may come into contact.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a "policy or custom" that is actionable under section 1983.[18]  *Id.* at 389; *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("[T]he failure to train must reflect[ ] a deliberate or conscious choice by a municipality.") (citations and internal quotation marks omitted).

There is no evidence in this case that the County or supervisory defendants adopted a policy of not training, or accepted a permanent and well-settled practice of not training, ADC medical or mental health personnel.  To the contrary, training of the nurses, mental health professional, and doctors resulted in Ms. Goggin timely and appropriately being identified as at risk for withdrawal syndrome.  Training of the nurses, mental health professional, and doctors also resulted in screening orders and repetitive screenings to assess Ms. Goggin and to help her maintain her fluid intake while treating her nausea and vomiting.  And training of the nurses and doctors also resulted in repetitive monitoring of Ms. Goggin's heart rate and other vital signs, and the escalation of Ms. Goggin's care as soon as her heart rate increased over her baseline and was not responsive to oral fluids.

---

[18]  As the *Boyett* Court explained (2006 WL 3422104, at *31 (citing *Canton*, 489 U.S. at 391)):

> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality], for the officer's shortcomings may have resulted from factors other than a faulty training program.  Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.  And plainly, adequately trained officers make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable.

Rather than evidencing no training, the record in this case amply demonstrates that all the individually named defendants were <u>well trained</u> and effective in recognizing, assessing, treating, monitoring, and—if necessary—escalating treatment for alcohol or drug withdrawal.  The record also shows that Ms. Goggin's CIWA scores never suggested she had significant withdrawal symptoms or severe dehydration, and that she was promptly referred to the Doctor Call List, and from there to the Acute Medical Unit, as soon as her vital signs increased over her baseline and were not responsive to oral fluids.

There is no reasonable argument, and no reasonable juror could find, that the County's training (or the conduct of its well-trained employees) evidences "deliberate indifference" to the rights of Ms. Goggin, or the rights of ADC inmates generally.  The County is entitled to judgment as a matter of law on this cause of action.

C.    <u>As a Matter of Law, the Individual Named Defendants Are Also Not Liable For "Failure to Train" or "Supervise"</u>

As to the individual Defendants named in this cause of action—i.e., Sheriff Winder, Former Chief Cook, and Wellcon—even if a constitutional violation by subordinates had been established, "there is no concept of strict supervisor liability under [section] 1983." *Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir. 1996) (citing *Ruark v. Solano*, 928 F.2d 947, 950 (10th Cir. 1991); *see also Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) ("Liability . . . must be based upon more than a mere right to control employees.").  There also is no supervisor liability based on "mere negligence."  *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997).

Instead, to establish supervisor liability under section 1983, "the plaintiff must establish 'a deliberate, intentional act by the supervisor to violate constitutional rights.'" *Jenkins*, 81 F.3d at 994-95 (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir. 1992)).

Supervisory defendants thus may be held liable for the alleged unconstitutional acts of their subordinates only if they actively participated or acquiesced in the constitutional violation. *See Winters v. Board of County Comm'rs,* 4 F.3d 848, 855 (10th Cir. 1993); *Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir. 1990) ("For supervisory liability [in a [section] 1983 action], plaintiffs must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation.").

First, in specific regard to an alleged "failure to train," a "lack of training claim fails without proof that [the supervisor] made a conscious decision to adopt a policy of not training or accepted a permanent and well-settled practice of not training."[19]  *Boyett*, 2006 W.L. 3422104, at *23 (citing *Simmons v. City of Phila.*, 947 F.2d 1042, 1059 (3d Cir. 1991); *Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985).  Here, there is no evidence at all that any of the supervisory defendants in this case made a "conscious decision to adopt a policy of not training or accepted a permanent and well-settled practice of not training."  *Boyett*¸ 2006 W.L. 3422104, at *23.  To the contrary, the record indisputably shows that the subordinates in question were trained, and were trained well.  No reasonable juror could conclude otherwise.

Second, in specific regard to an alleged "failure to supervise," "liability for failure to supervise or correct misconduct requires, among other things, that the defendant be 'adequately

---

[19]  *See also Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988) ("A supervisor or municipality may be held liable [only] where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable."); *but see Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 768 (10th Cir. 2013) (questioning whether, post-*Iqbal*, which articulated a stricter liability standard, the *Meade* standard is still good law, but declining to decide the question).

put on notice of the prior misbehavior.'"  *Boyett*, 2006 WL 2422104, at *23 (quoting *McClelland*

*v. Facteau*, 610 F.2d 693, 697 (10th Cir. 1979)).  Whether a supervisor is found to have had the

requisite "notice" is evaluated using the standard of a reasonable person under the circumstances.

*McClelland*, 610 F.2d at 697.  Only when such "notice" has been established can there be a

supervisory duty (if any) to take affirmative steps to prevent violation of potential plaintiffs'

rights.  *Id.* at 698.  Here, there is no evidence whatsoever that the supervisory defendants, or any

of them, were "adequately put on notice" of any actual training deficiencies—which is not

surprising, given that there were <u>no such deficiencies</u>.  Again, no reasonable juror could

conclude otherwise.

The supervisory defendants are entitled to judgment as a matter of law on this cause of

action.

**5.      Defendants are Entitled to Judgment as a Matter of Law on Plaintiff's Claims for
        "Unnecessary Rigor" Under the Utah State Constitution.**

Plaintiff may not recover damages under article I, section 9 of the Utah State Constitution

unless she shows that Ms. Goggin's injury was caused by a jail employee who acted with

deliberate indifference or inflicted unnecessary abuse upon her.  *Bott v. DeLand*, 922 P.2d 732,

740 (Utah 1996), *abrogated on other grounds by Spackman ex rel. Spackman v. Bd. of Educ. of

Box Elder Cty. Sch. Dist.*, 16 P. 3d 533 (Utah 2000).

As with the Eighth Amendment to the United States Constitution, the deliberate

indifference standard for purposes of state constitutional claims differentiates between

inadvertent misconduct, which does not give rise to liability, and the "unnecessary and wanton

infliction of pain," which does.  As the Utah Supreme Court has explained (*Bott*, 922 P.2d at

740):

For example, a physician who is guilty of medical malpractice is not guilty of a constitutional violation "merely because the victim is a prisoner." [*Estelle*, 429 U.S.] at 106; *El'Amin v. Pearce,* 750 F.2d 829, 832 (10th Cir. 1984); *Brown v. Schiff,* 614 F.2d 237, 239 (10th Cir. 1980).  Similarly, a prison worker's inadvertent failure to provide adequate medical care would not support a constitutional claim for damages.  *Estelle,* 429 U.S. at 105; *Olson v. Stotts,* 9 F.3d 1475, 1476–77 (10th Cir. 1993); *Daniels v. Gilbreath,* 668 F.2d 477, 488 (10th Cir. 1982)

"Unlike the deliberate indifference standard, the unnecessary abuse standard has not been widely explored." *Bott*, 922 P.2d at 740.  Under this standard, the main consideration is "whether a particular prison or police practice would be recognized as an abuse to the extent that it cannot be justified by necessity."  *Id.* (quoting *Sterling v. Cupp*, 625 P.2d 123, 130 (Or. 1981)).  The definition of "abuse" focuses on "needlessly harsh, degrading, or dehumanizing" treatment of prisoners. *Id.* (quoting *Sterling*, 625 P.2d at 131).

Finally, to recover monetary damages for an alleged violation of Ms. Goggin's constitutional rights, the plaintiff here must establish, among other things, that Ms. Goggin suffered a "flagrant" violation of her constitutional rights.  *Dexter v. Bosko*, 184 P.3d 592, 597-98 (Utah 2008).  The flagrant violation element, "ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [himself] liable for a constitutional violation."  *Id.* at 598.

For substantially the same reasons that Defendants are entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claim, *see* discussion supra at pp. 36-39, and why the individually named defendants are entitled to qualified immunity, *see* discussion supra at pp. 28-36, no reasonable juror could find Defendants (or any of them) liable on Plaintiff's state constitutional claim.

The undisputed facts show Ms. Goggin: (i) was screened by several health care professionals when she was being booked into the ADC on August 11, 2010; (ii) was monitored at least twice daily between August 12 and August 15, 2010, to ensure her CIWA scores and vital signs were consistent both with withdrawal patients generally and Ms. Goggin's own baseline (which they were); (iii) was promptly assessed and treated by nursing professionals (with doctor consultation as necessary) when she submitted a Sick Call Request Form or was reported to be vomiting in her cell; (iv) was timely and consistently provided with Gatorade to assist with proper hydration; (v) was prescribed and given oral Phenergan to treat her nausea and vomiting; and (vi) was referred to the Doctor Call List, and then transferred to the Acute Medical Unit, once her heart rate increased over her baseline and was not responsive to oral fluids.

Given the extensive interactions by Ms. Goggin with medical personnel, as well as their well-documented efforts to treat Ms. Goggin's observed condition and reported complaints, no reasonable juror could conclude that these defendants, or any of them, were "deliberately indifferent" to her serious medical needs, or in any way intended to inflict "unnecessary abuse" upon her. *Bott*, 922 P.2d at 740. At most—and only with the benefit of hindsight—Plaintiff might plausibly argue that Defendants, despite Ms. Goggin's low CIWA scores and vital signs within the normal range, were mistaken in their assessments of Ms. Goggin's condition and should have ordered significant medical intervention earlier. Even if a juror were to agree with that argument—and Defendants believe no juror would—it is insufficient to impose liability in this case. *See id*. ("[A] physician who is guilty of medical malpractice is not guilty of a constitutional violation . . . . Similarly, a prison worker's inadvertent failure to provide adequate medical care would not support a constitutional claim for damages." (internal citations and

quotation marks omitted); *see also Dexter*, 184 P.3d at 598 (holding that the "flagrant violation"

requirement for monetary liability "ensures that a government employee is allowed the ordinary

human frailties of forgetfulness, distractibility, or misjudgment without rendering [himself] liable

for a constitutional violation.").

Because no reasonable juror could find that Plaintiff can satisfy the standard for liability

under the Utah State Constitution, Defendants are entitled to summary judgment on this cause of

action.

**6.     Plaintiff's Demands for Punitive Damages Are Deficient as a Matter of Law and
         Should be Dismissed.**

Punitive damages may not be awarded against the County.  *City of Newport v. Fact*

*Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[W]e hold that a municipality is immune from

punitive damages under 42 U.S.C. [section] 1983."); *Ray v. City of Edmond*, 662 F.2d 679, 680

(10th Cir. 1981) (applying *City of Newport* to reverse award of punitive damages against

municipality).  Plaintiff's demands for punitive damages against the County (Compl. at ¶¶ 57,

66, 73, 87) are thus defective as a matter of law and should be stricken and dismissed.

As against the other named defendants, punitive damages may be awarded only if their

"conduct is shown to be motivated by evil motive or intent, or when it involves reckless or

callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56

(1983). *see also id.* ("We further hold that this threshold applies even when the underlying

standard of liability for compensatory damages is one of recklessness.").

On the facts of this case, where the undisputed facts amply demonstrate that Defendants

diligently—and consistently with their training and ADC policies—recognized, assessed, treated,

monitored, and when necessary escalated Ms. Goggin's medical treatment, it simply cannot be

argued that they, or any of them, were motivated either by "evil motive or intent" or by "callous indifference" to Ms. Goggin's rights.  This is especially so given that Ms. Goggin's CIWA scores never suggested she had significant withdrawal symptoms or severe dehydration, and she was promptly referred to the Doctor Call List, and from there to the Acute Medical Unit, when her vital signs increased over her baseline and were not responsive to oral fluids.

There is no evidence, nor could there be, sufficient to support a jury award of punitive damages in this case.  Defendants are entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, Defendants respectfully urge the Court to find that Ms. Goggin's constitutional rights, including her Eighth Amendment right to be free of cruel and unusual punishment, were not violated by Defendants, whether individually or as a whole.  There is no evidence on which any reasonable juror could conclude that Defendants, or any of them, were deliberately indifferent to Ms. Goggin's serious medical needs.  Even without more, that entitles the individually named defendants to qualified immunity and dismissal from the case.

In addition, there is no evidence that the County maintained constitutionally defective policies, practices, or customs causally linked to any alleged constitutional violation, or that any supervisory defendant was actually involved in (or had actual advance knowledge of) any alleged unconstitutional act or omission by their subordinates.

Accordingly, Defendants are entitled to judgment as a matter of law on each of Plaintiff's causes of action and dismissal of her case in full and with prejudice.

Dated this <u>31st</u> day of January, 2014.

                      SIM GILL
                      Salt Lake County District Attorney

                      <u>/s/ Darcy M. Goddard</u>
                      Darcy M. Goddard
                      Donald H. Hansen
                      Deputy District Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on the <u>31st</u> day of January, 2014, I electronically filed a true and

correct copy of the foregoing Defendants' Motion for Summary Judgment and Memorandum in

Support (with Exhibits) using the CM/ECF System and served a true and correct copy by United

States mail, first-class postage prepaid, to the following:

Mary C. Corporon
Mark A. Flores
Van Cott, Bagley, Cornwall & McCarthy
36 S. State Street
Suite 1900
Salt Lake City, Utah 84111

Attorneys for Plaintiff

/s/      Darcy M. Goddard