# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **NATALIE MARIE STEVENSON, mother, personal representative, and heir to LINDSEY GOGGIN, deceased; and THE ESTATE OF LINDSEY GOGGIN, by her Personal Representative Natalie Stevenson,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiffs,** | **Case No. 2:12-cv-44-PMW** |
| **v.** | |
| **SALT LAKE COUNTY, et al.,** | |
| **Defendants.** | **Magistrate Judge Paul M. Warner** |

All parties in this case have consented to United States Magistrate Judge Paul M. Warner conducting all proceedings, including entry of final judgment, with appeal to the United States Court of Appeals for the Tenth Circuit.[1]  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  Before the court is Defendants' motion for summary judgment.[2]  The court heard oral argument on the motion on July 28, 2014.[3]  Mary C. Corporon appeared on behalf of Plaintiff.[4]  Darcy M. Goddard and Donald H. Hansen appeared on behalf of Defendants.  At the conclusion of the

---

[1] *See* docket no. 33.

[2] *See* docket no. 51.

[3] *See* docket no. 75.

[4] Natalie Marie Stevenson, who will be referred to as "Plaintiff" in this memorandum decision and order, brought this action as mother, personal representative, and heir of Lindsey Goggin ("Goggin"), and as personal representative of Goggin's estate.

hearing, the court took the motion under advisement. The court has carefully considered the parties' written submission on the motion, as well as the arguments presented by counsel at the hearing. Now being fully advised, the court issues the instant memorandum decision and order.

## FACTUAL BACKGROUND

### I. Preliminary Matters Concerning Factual Background

Before reciting the factual background for this case, the court must address a preliminary matter. In their motion, Defendants recite facts contained in affidavits, expert declarations, and business records, all of which appear to be admissible in evidence. In response to Defendants' statement of facts, Plaintiff does not comply with civil rule 56-1 of the Rules of Practice for the United States District Court for the District of Utah. *See* DUCivR 56-1. Specifically, Plaintiff does not provide "[a] response to each stated material fact" and if any fact is disputed, "so state and concisely describe and cite with particularity the evidence on which the non-moving party relies to dispute that fact." DUCivR 56-1(c)(2)(B). Plaintiff further fails to provide "[a] statement of any additional material facts, if applicable . . . stat[ing] each such fact separately in an individually numbered paragraph that cites with particularity the evidence in the record supporting each factual assertion (e.g., deposition transcript, affidavit, declaration, and other documents)." DUCivR 56-1(c)(2)(C). Plaintiff has also failed to argue that any of the undisputed material facts set forth in Defendants' motion are not properly supported or otherwise insufficient to meet the requirements of rule 56 of the Federal Rules of Civil Procedure. Pursuant to civil rule 56-1(c)(3),

> [f]or the purpose of summary judgment, all material facts of record meeting the requirements of Fed. R. Civ. P. 56 that are set forth with particularity in the movant's statement of material facts will be deemed admitted unless specifically controverted by the

> statement of the opposing party identifying and citing to material
> facts of record meeting the requirements of Fed. R. Civ. P. 56.

DUCivR 56-1(c)(3).

Given Plaintiff's failure to abide by civil rule 56-1, the court concludes, pursuant to that rule, that Defendants' statement of material facts is deemed admitted. The court further notes that Defendants' counsel asserted during oral argument that the facts of this case, as set forth by Defendants, were undisputed, and Plaintiff's counsel did not voice any disagreement with that assertion.

While Plaintiff has included a statement of facts (although listed under the header of "Argument"), those facts are not supported by citation "with particularity [to] the evidence in the record supporting each factual assertion (e.g., deposition transcript, affidavit, declaration, and other documents)." DUCivR 56-1(c)(2)(C). While some of the factual statements are indeed facts, the vast majority of them are conclusory and speculative arguments by counsel. As the court will note below, on a motion for summary judgment, "[t]he movant bears an initial burden to show an absence of evidence to support an essential element of the non-movant's case." *Johnson v. City of Bountiful*, 996 F. Supp. 1100, 1102 (D. Utah 1998). If the movant carries its initial burden, the nonmovant may not rest upon her pleadings, but must instead "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (quotations and citations omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id*. Plaintiff has not done so in this case with the vast majority of her recitation of facts. Accordingly, they are not admissible in evidence and will not be considered

for purposes of opposing Defendants' motion. *See Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995) ("[T]he nonmoving party need not produce evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible." (quotations and citation omitted)).

## II. Factual Background

Plaintiff's complaint contains causes of action for cruel and unusual punishment under the Eighth Amendment; "Failure to Train and/or Supervise" under the Eighth Amendment; "Unlawful Custom, Policy[,] or Practice" under the Eighth Amendment; and cruel and unusual punishment and "unnecessary rigor" under Article I, Section 9 of the Utah State Constitution. In her complaint, Plaintiff names the following parties, who are referred to collectively as "Defendants" in this memorandum decision and order:

1.  Salt Lake County ("County").

2.  James M. Winder, individually and in his capacity as Salt Lake County Sheriff ("Winder").

3.  Rollin Cook, individually and in his capacity as the Salt Lake County Jail Commander ("Cook").

4.  Wellcon, LLC. and Wellcon Inc., the County's contracted healthcare providers at the ADC ("Wellcon").

5.  Dr. Russell Vinik, individually and in his capacity as a County employee ("Dr. Vinik").

6.  Dr. Todd R. Wilcox, individually and in his capacity as a County employee ("Dr. Wilcox").

7.  Nurse Julie Evans, individually and in her capacity as a County employee ("Evans").

8.  Nurse Elizabeth Hardy, individually and in her capacity as a County employee ("Hardy").

9. Nurse Kristyn Smith, individually and in her capacity as a County employee ("Smith").[5]

This case arises from the in-custody death of Goggin at the Salt Lake County Adult Detention Center ("ADC") on August 15, 2010. Goggin was taken into custody by law enforcement on charges of possession of a controlled substance and possession of drug paraphernalia, and repeated drug-related parole violations, in the late afternoon or early evening on August 11, 2010. Goggin was delivered to the ADC by law enforcement officers before 7:45 p.m. on August 11, 2010.

Prior to accepting any inmate for booking into the ADC, the nursing staff will conduct what is known as a "Nursing Pre-Screen Examination." If serious health problems are detected during that examination, the prisoner is referred to a hospital for care prior to being approved for entrance into the ADC.

During her Nursing Pre-Screen Examination, conducted at approximately 7:45 p.m. on August 11, 2010, Goggin denied any use of illegal drugs. Based on that representation and Goggin's other statements and physical examination results at that time, Goggin was cleared for booking into the jail. At the conclusion of her Nursing Pre-Screen Examination, Goggin was referred for a Comprehensive Mental Health Interview. During her Comprehensive Mental Health Interview, conducted later that evening at approximately 9:45 p.m., Goggin acknowledged past substance abuse treatment and admitted to drinking alcohol approximately one time per month, use of crack cocaine, and daily use of heroin in an amount of "two baggies"

---

[5] Two other individuals were named as defendants in this case (Carol Kelsch and Eric Lindley), but have since been dismissed on motions by Plaintiff. *See* docket nos. 34, 35, 43, 44.

per day.  Goggin stated she had used heroin for one or two years and had last used it earlier that day.  She also reported having used crack cocaine earlier that day.

Based on that information, the mental health professional diagnosed Goggin as having opiate and cocaine dependency, and classified Goggin as having "positive risk factors for withdrawal."  The mental health professional also referred Goggin for a follow-up assessment.

Shortly thereafter, Goggin received a Comprehensive Nursing Evaluation.  During her Comprehensive Nursing Evaluation, conducted at approximately 10:54 p.m. on August 11, 2010, Goggin again admitted to drinking alcohol approximately one time per week, use of crack cocaine, and daily use of heroin in an amount of two grams per day.  Her vital signs were taken and registered well within the range of normal, with blood pressure of 123/79 and a heart rate of 75.

Based on that information, the booking nurse classified Goggin as having "positive risk factors for withdrawal," but noted Goggin was asymptomatic at that time.  The booking nurse also issued Goggin a bottom bunk clearance for her safety and ordered that she receive daily assessments for symptoms of withdrawal.

One of the assessments for withdrawal from drugs or alcohol that is used routinely by medical personnel at the ADC and most other correctional facilities and hospitals in the United States is a "CIWA score," which stands for "Clinical Institute Withdrawal Assessment." The CIWA score is an internationally validated assessment tool that has been in use for many years and is considered to be the highest standard for assessing patients experiencing signs and symptoms of withdrawal.  In calculating an inmate's CIWA score, medical personnel are trained to take into account a variety of withdrawal symptoms, such as nausea, sweating, anxiety or

agitation, headaches, and hallucinations. Each symptom that is reported or observed is assigned a score ranging from zero to seven. The numbers are then added up and recorded as an inmate's total CIWA score. In general, and as reflected in the policies of the ADC, medical intervention is initiated once a CIWA score reaches twelve. In addition to the CIWA score, medical professionals at the ADC are also trained to closely monitor the vital signs of inmates withdrawing from alcohol or drugs. The measurement of vital signs provides an objective cross-check for an inmate's regular CIWA assessments.

Following Goggin's Comprehensive Nursing Evaluation, a nurse recorded on Goggin's CIWA Worksheet and logged into the ADC's computerized medical records system Goggin's CIWA score, which at that time was zero. Her vital signs were also assessed and were well within the range of normal, with blood pressure of 123/79, a heart rate of 75, and a temperature of 97.6.

At approximately 8:00 a.m. the next morning, August 12, 2010, Goggin's CIWA score was assessed, recorded on her CIWA Worksheet, and logged into the ADC's computerized medical records system. Again, her CIWA score was zero. Her vital signs were again assessed and she had a blood pressure of 126/85, a slightly elevated heart rate of 130, and a temperature of 97.0. This is not uncommon for individuals withdrawing from alcohol or drugs. Goggin was given Gatorade to ensure she remained properly hydrated. Gatorade or other electrolyte replacement fluids are commonly prescribed at the ADC to assist with rehydrating patients who experience nausea and vomiting. The use of Gatorade in a correctional facility is rare; most facilities use only water, which is not nearly as effective.

At approximately 3:30 p.m. that same day, August 12, 2010, Goggin's CIWA score was again assessed, recorded on her CIWA Worksheet, and logged into the ADC's computerized medical records system. At that time, her CIWA score was three, with two points (out of seven) assessed for nausea and one point (out of seven) assessed for tremors. A recorded score of two points for nausea would place Goggin somewhere between "mild nausea, no vomiting" (one point) and "intermittent nausea and dry heaves" (four points). This is not uncommon for individuals withdrawing from alcohol or drugs. Her vital signs remained normal for a withdrawal patient, with blood pressure of 123/85, heart rate of 108, and a temperature of 98.8.

Goggin had a follow-up CIWA assessment early the next morning, August 13, 2010, at approximately 7:12 a.m. At that time, she was again assessed with a CIWA score of three, with three points (out of seven) assessed for nausea. Her vital signs showed a slight elevation in blood pressure to 142/96, a slightly elevated heart rate of 117, and temperature of 96.9. Those vital signs are not unusual for a patient withdrawing from alcohol or drugs. Goggin was again given Gatorade to ensure she remained properly hydrated.

At approximately 3:00 p.m. that day, August 13, 2010, Goggin's CIWA score was again assessed as a three, with three points (out of seven) assessed for nausea. Her CIWA score was recorded on her CIWA Worksheet and logged into the ADC's computerized medical records system. Her vital signs were taken and were well within the range of normal for a withdrawal patient, with blood pressure of 133/96, a heart rate of 117, and a temperature of 98.0. She was given more Gatorade to ensure proper hydration.

Goggin was also seen late at night on August 13, 2010, by a "triage nurse," Smith. Goggin reported "difficulty breathing from heroin withdrawal," "vomiting all day," and chest

pains.  Contrary to her earlier statements to nursing staff on August 11, 2010, she told Smith that she had been using "5 balloons of heroin a day for the past six months."  Smith checked Goggin's vital signs, which were within the range of normal for a withdrawal patient, with blood pressure of 134/84 and a heart rate of 111.

Nevertheless, Smith called the on-call doctor, Dr. Vinik, to advise him of Goggin's complaints and, on Dr. Vinik's orders, filled a prescription for Goggin of oral Phenergan to be taken twice daily for the next three days.  Phenergan is an effective anti-nausea medication often prescribed at the ADC and other correctional facilities and hospitals nationwide to treat patients who are experiencing nausea and vomiting.  Records indicate Goggin received her Phenergan as prescribed on August 14 and 15, 2010.  Records further indicate that was Smith's only medical interaction with Goggin.

Goggin was again seen at approximately 9:00 a.m. on August 14, 2010.  At that time, she was again assessed with a CIWA score of three, with three points (out of seven) assessed for nausea.  Her CIWA score was recorded on her CIWA Worksheet and logged into the ADC's computerized medical records system.  Her vital signs showed a slight elevation in blood pressure to 142/94, a slightly elevated heart rate of 104, and a temperature of 97.2.  This is not uncommon for individuals withdrawing from alcohol or drugs.  Additionally, these results were consistent with her previous vital sign measurements and CIWA scores.

The same nurse saw Goggin again at approximately 2:30 p.m. on August 14, 2010.  Her CIWA score was unchanged and her blood pressure of 134/91 was back within the range of normal.  Her CIWA score was recorded on her CIWA Worksheet and logged into the ADC's computerized medical records system.

Around midnight on August 15, 2010, the nursing staff received a call about Goggin throwing up in her cell. Goggin was seen very shortly thereafter, at approximately 1:00 a.m., by another "triage nurse," Hardy. Hardy observed Goggin on her bunk "with [a] medium amount of vomit in the garbage can next to her." Hardy took Goggin's vital signs, which showed a slightly elevated blood pressure of 140/99 and a slightly elevated heart rate of 135. Goggin told Hardy she was in "her third day of withdrawing from heroin, and that these are normal symptoms for her when she withdraws." Hardy observed Goggin to be "alert & oriented [and] cooperative." Goggin was advised to "stay well-hydrated (sips, not gulps), and to get some rest." Hardy noted that Goggin "verbalized understanding and had no further complaints at [that] time." Records indicate that was Hardy's only medical interaction with Goggin.

Goggin submitted a Sick Call Request Form early in the morning on August 15, 2010. She reported that she was "violently throwing up" and that her heart, although better, still felt "faster than it should." In response, Goggin was seen by another nurse at approximately 9:00 a.m. on August 15, 2010. Although her blood pressure was initially elevated, it dropped to 96/58, and she had a heart rate of 110 after she drank some Gatorade. The nurse placed Goggin's name on the Doctor Call List to be seen that day.

Goggin's next regular CIWA assessment occurred at approximately 11:15 a.m. on August 15, 2010. At that time, she was assessed with a CIWA score of five, with four points assessed for nausea and, for the first time, one point assessed for anxiety. Her CIWA score was recorded on her CIWA Worksheet and logged into the ADC's computerized medical records system. Goggin's blood pressure and temperature were well within the range of normal. Her blood

pressure was 100/60, her heart rate was elevated to 140, and her temperature was 97.8. Goggin was again given Gatorade to ensure she remained properly hydrated.

Goggin saw the on-call doctor, Dr. Vinik, shortly thereafter. Dr. Vinik took her vital signs, which remained stable and were normal for a withdrawal patient, with blood pressure of 96/58, a heart rate of 120, and a temperature of 96.8. Dr. Vinik observed, however, that she was "ill appearing" and had been "unable" to "keep down" her oral Phenergan medication. Dr. Vinik decided to admit Goggin to the Acute Medical Unit for a laboratory evaluation and, if necessary and advisable, administration of intravenous ("IV") fluids and medications (Zofran) to speed her recovery from her withdrawal. He also prescribed Phenergan suppositories. Phenergan suppositories are often prescribed at the ADC and other correctional facilities and hospitals nationwide when oral Phenergan has been ineffective or cannot be tolerated by the patient because of ongoing vomiting. Zofran is a stronger IV anti-nausea medication commonly given if Phenergan proves to be ineffective. It is important to obtain a complete blood count and basic metabolic panel at the beginning of any significant administration of IV fluids or medications to ensure the patient's electrolytes are within a safe range. Making this determination is critical to selecting the proper IV fluid to administer so that any abnormalities will be corrected and to avoid diluting out electrolytes by overusing the incorrect replacement fluid. These tests also ensure the patient's kidneys are working properly and can safely handle the ordered fluid load.

After her appointment with Dr. Vinik, which concluded at approximately 2:00 p.m., Goggin returned to her cell to wait while an order was placed to transport her to the Acute Medical Unit. After her doctor's appointment but prior to being transported to the Acute

Medical Unit, Goggin vomited in her cell. Housing Officer Jeffrey Gonzales checked on her at 2:06 p.m., advised her to keep drinking the Gatorade and water, and to "get [his] attention if she needed anything."

At approximately 2:40 p.m., Goggin's cellmate called the Control Room to say Goggin was having trouble breathing. Housing Officer Gonzales again went to check on Goggin. Goggin advised him she was already scheduled to be admitted into the Acute Medical Unit. Housing Officer Gonzales advised Goggin to sit up, breathe slowly, and keep drinking liquids. Housing Officer Gonzales also called a nurse, who said she would "be in the unit next to see her." The nurse in question was the same nurse who had seen Goggin earlier that day, at approximately 11:15 a.m. Prior to the nurse's arrival, however, officers arrived to transport Goggin to the Acute Medical Unit. Goggin was transported to the Acute Medical Unit. She was placed in a room in the Acute Medical Unit at approximately 3:00 p.m. At approximately 3:03 p.m., a nurse in the Acute Medical Unit observed that Goggin seemed to be in distress, and requested and obtained the keys to her room. Within two minutes, by 3:05 p.m., the nurse called for Dr. Vinik, who was already in the Acute Medical Unit helping another inmate, and CPR was started on Goggin. Records indicate that Evans was part of the team that treated Goggin in the Acute Medical Unit on August 15, 2010. Records further indicate that this was Evans's only medical interaction with Goggin.

At approximately 3:07 p.m., ADC staff called for an ambulance and prepared to transport Goggin to the ambulance bay. Goggin was taken from the Acute Medical Unit at approximately 3:15 p.m., and the ambulance arrived by approximately 3:18 p.m. The ambulance arrived at St. Marks Hospital at approximately 3:36 p.m., and Goggin was declared dead at approximately

3:50 p.m. The laboratory findings and autopsy suggest Goggin was moderately volume depleted and likely had an electrolyte imbalance that caused a sudden fatal arrhythmia. Chronic illicit drug use is known to be toxic to the human heart over time. Goggin had findings on her autopsy that correlate with cardiac damage.

Also consistent with the lab findings, physical examination findings, and witnesses' recollection of events would be a finding that Goggin suffered from early-stage Ogilvie's Syndrome. Ogilvie's Syndrome can occur in high dose opiate users. It is basically an opiate-induced ileus, which is a lack of bowel motion that looks initially like a bowel obstruction, but is due to lack of peristalsis rather than a kink in the bowel. Although Ogilvie's Syndrome is not common, its symptoms in the early stages correlate to Goggin's physical condition, including a lack of absorption of orally ingested liquids, diarrhea, repetitive vomiting despite the administration of Phenergan, and potentially severe electrolyte abnormalities.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As noted above, "[t]he movant bears an initial burden to show an absence of evidence to support an essential element of the non-movant's case." *City of Bountiful*, 996 F. Supp. at 1102; *see also Allen v. Muskogee, Okla.*, 119 F.3d 837, 840 (10th Cir. 1997) ("The moving party need not affirmatively negate the nonmovant's claim in order to obtain summary judgment. Instead, the movant only bears the initial burden of showing – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." (quotations and citations omitted)).

Also as noted above, if the movant carries its initial burden, the nonmovant may not rest upon her pleadings, but must instead "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (quotations and citations omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id*. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Salehpoor v. Shahinpoor*, 358 F.3d 782, 786 (10th Cir. 2004) (quotations and citation omitted).

## ANALYSIS

As previously noted, Plaintiff's complaint contains causes of action for cruel and unusual punishment under the Eighth Amendment; "Failure to Train and/or Supervise" under the Eighth Amendment; "Unlawful Custom, Policy[,] or Practice" under the Eighth Amendment; and cruel and unusual punishment and "unnecessary rigor" under Article I, Section 9 of the Utah State Constitution. Defendants present arguments for each of Plaintiff's causes of action, along with an argument concerning qualified immunity. Defendants also present an argument concerning Plaintiff's demands for punitive damages. The court will first address the qualified immunity argument, followed by the arguments for each cause of action and the argument concerning punitive damages.

### I.  Qualified Immunity

Defendants first argue that the individually named Defendants (Smith, Hardy, Evans, Dr. Wilcox, Dr. Vinik, Winder, and Cook) are entitled to qualified immunity in this case.

Once an individually named defendant invokes the affirmative defense of qualified immunity, "the plaintiff must satisfy a two-part test." *Scull v. N. M.*, 236 F.3d 588, 595 (10th Cir. 2000). As part of this "heavy two-part burden," *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995), the plaintiff must first establish that the defendant's acts or omissions "violated a constitutional or statutory right." *Id.* Here, the constitutional or statutory right at issue is Goggin's Eighth Amendment right to be free from cruel and unusual punishment. To establish that such a right was "violated," Plaintiff would need to show that Defendants were "deliberate[ly] indifferen[t] to [the] serious medical needs" of Goggin. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To show "the requisite deliberate indifference," she must demonstrate that the need was "sufficiently serious," *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quotations and citations omitted), and that "the official [was] both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "If an official is aware of the potential for harm but takes reasonable efforts to avoid or alleviate that harm, he bears no liability under this standard." *Despain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001).

To satisfy the second part of Plaintiff's "heavy two-part burden," *Albright*, 51 F.3d at 1534, she must show the right at issue was clearly established at the time of the defendant's unlawful conduct. *See id.* "In assessing whether a right was clearly established, the court must look at the objective legal reasonableness at the time of the challenged action and ask if 'the right [was] sufficiently clear that a reasonable officer would understand that what he [was] doing violate[d] that right.'" *Boyett v. Wash. Cnty.*, No. 2:04CV1173, 2006 WL 3422104, at *14 (D. Utah Nov. 28, 2006) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)) (alterations in

original).  "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."  *Wilson*, 526 U.S. at 615.  If Plaintiff fails to satisfy any part of that two-part inquiry, the court must grant qualified immunity to the individually named Defendants in this case.  *See Hesse v. Town of Jackson, Wyo.*, 541 F.3d 1240, 1244 (10th Cir. 2008).

With respect to the second part of the test, Defendants contend that the specific "right" at issue, to receive intravenous fluids and medication while withdrawing from drugs or alcohol despite having low CIWA scores and vital signs in the normal range, is not clearly established for purposes of qualified immunity.  However, because Defendants assert that they were not deliberately indifferent to Goggin's serious medical needs under the first part of the test, as will be addressed below, Defendants maintain that it is not necessary for this court to decide whether the specific "right" alleged by Plaintiff was clearly established.  *See id.*

## A.  Smith, Hardy, and Evans

Smith, Hardy, and Evans each had only one contact with Goggin during the course of her short time at the ADC.  Defendants argue that, far from demonstrating deliberate indifference, Smith, Hardy, and Evans acted reasonably in assessing and responding to Goggin's condition and complaints and, thus, each is entitled to qualified immunity.

### 1.  Smith

Smith responded as a "triage nurse" to Goggin's cell in the late evening of August 13, 2010.  Smith checked Goggin's vital signs, all of which were in the range of normal for a withdrawal patient.  Out of an abundance of caution, and in light of Goggin's report of chest pains, Smith telephoned the on-call doctor, Dr. Vinik, to advise him of Goggin's complaints and,

on Dr. Vinik's orders, filled a prescription for Goggin of oral Phenergan to be taken twice daily for the next three days. That was Smith's only medical interaction with Goggin.

Based on those undisputed facts, the court concludes that no reasonable jury could find that Nurse Smith was deliberately indifferent to Goggin's serious medical needs. Smith saw Goggin only once, examined and assessed her appropriately, and thereafter consulted with the on-call doctor to obtain (and did obtain) a prescription to treat Goggin's reported nausea and vomiting. Furthermore, at that time, Goggin's symptoms, which were far from evidencing an emergency or any "sufficiently substantial danger," *Farmer*, 511 U.S. at 844, were entirely consistent with patients undergoing withdrawal from alcohol or drugs. Because Smith acted reasonably to avoid or alleviate any potential harm to Goggin, the court concludes that she is entitled to qualified immunity. *See Despain*, 264 F.3d at 975.

### 2. Hardy

Like Smith, Hardy interacted with Goggin only once, when she responded as a "triage nurse" in response to a call about Goggin throwing up in her cell. Also like Smith, Hardy checked Goggin's vital signs, which were slightly elevated but not uncommon for a withdrawal patient. Goggin explicitly advised Hardy that she had withdrawn from heroin before and "these were normal symptoms for her when she withdraws." Based on that representation and Goggin's vital signs and alert appearance, Hardy appropriately advised Goggin to "stay well-hydrated (sips, not gulps), and to get some rest." Hardy also recorded in her notes that Goggin "verbalized understanding and had no further complaints at [that] time."

Based on those undisputed facts, the court concludes that Goggin did not, at the time Hardy saw her, have symptoms that evidenced a "sufficiently substantial danger." *Farmer*, 511

U.S. at 844. Instead, Goggin's symptoms, both observed and reported, were entirely consistent with any withdrawal patient and, equally important, consistent with Goggin's own self-reported past experiences with heroin withdrawal. The court has determined that no reasonable jury could conclude that Hardy was deliberately indifferent to Goggin's serious medical needs. As with Smith, because Hardy acted reasonably to avoid or alleviate any potential harm to Goggin, the court concludes that Hardy is entitled to qualified immunity. *See Despain*, 264 F.3d at 975.

### 3. Evans

In her memorandum in opposition to Defendants' motion, Plaintiff concedes that Defendants are entitled to summary judgment on any claims against Evans. Consequently, the court need not address Defendants' arguments with respect to qualified immunity for Evans.

### B. Dr. Wilcox and Dr. Vinik

### 1. Dr. Wilcox

Defendants assert that because Dr. Wilcox did not himself treat Goggin, he had no opportunity to become "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed with Goggin, let alone to actually "draw the inference." *Farmer*, 511 U.S. at 837. Defendants argue that there is no evidence that he should be liable, individually or otherwise, for any alleged violation of Goggin's constitutional rights. The court agrees and concludes that Dr. Wilcox is entitled to qualified immunity.

### 2. Dr. Vinik

Defendants argue that Goggin's treating physician, Dr. Vinik, is also entitled to qualified immunity because there is no evidence that he was deliberately indifferent to Goggin's serious medical needs. Dr. Vinik was involved on three separate occasions with Goggin's medical

assessment and treatment while she was incarcerated at the ADC.  Defendants argue that on each occasion, Dr. Vinik assessed Goggin's condition and complaints and undertook "reasonable efforts to avoid or alleviate" any perceived harm to her.  *Despain*, 264 F.3d at 975.  While the prescribed treatments were ultimately unsuccessful, Defendants contend that it is not enough for Plaintiff to allege, with the benefit of hindsight, that Dr. Vinik may have failed "to alleviate a significant risk that he should have perceived but did not."  *Farmer*, 511 U.S. at 838; *see Estelle*, 429 U.S. at 105-06 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'"  Defendants argue that, instead, to establish a constitutional violation, Plaintiff must show that Dr. Vinik actually "[knew] of and disregard[ed] an excessive risk to [Goggin's] health or safety."  *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000) (quotations and citation omitted).

Dr. Vinik was first advised of Goggin's condition and complaints by telephone call Smith late at night on August 13, 2010.  Although Smith checked Goggin's vital signs and found them all to be in the range of normal for a withdrawal patient, out of an abundance of caution, she contacted Dr. Vinik, the on-call doctor, to discuss Goggin's condition.  Based on Smith's assessment and observations, Dr. Vinik prescribed Goggin oral Phenergan.  The court concludes that Goggin's condition at that time did not evidence a "sufficiently substantial danger."  *Farmer*, 511 U.S. at 844.  The court further concludes that no reasonable jury could find that Dr. Vinik did not take "reasonable efforts to avoid or alleviate" any perceived risk to her.  *Despain*, 264 F.3d at 975.

Defendants contend that the same is true with Dr. Vinik's visit with Goggin on August 15, 2010, which occurred within hours of her submitting a Sick Call Request Form, being evaluated by a nurse, and being placed on the Doctor Call List. Dr. Vinik took her vital signs, which remained stable and were normal for a withdrawal patient, with blood pressure of 96/58, a heart rate 120, and a temperature of 96.8. He observed, however, that she was "ill-appearing" and that she reported being "unable" to "keep down" her Phenergan oral medication. Accordingly, he decided to admit Goggin to the Acute Medical Unit for a laboratory evaluation and, if necessary and advisable, administration of IV fluids and medications to speed her recovery. He also prescribed Phenergan suppositories. Given those undisputed facts, the court concludes that no reasonable jury could find that Dr. Vinik failed to make "reasonable efforts" to treat Goggin, *id*., or that he "[knew] of and disregard[ed] an excessive risk to [Goggin's] health or safety." *Sealock*, 218 F.3d at 1209 (quotations and citation omitted).

The court now turns to Dr. Vinik's final interaction with Goggin. Within an hour of her previous visit with Dr. Vinik, which was no later than 3:00 p.m., Goggin was transported to and arrived in the Acute Medical Unit. Within minutes, Goggin became distressed and a full team of professionals, including Dr. Vinik, assembled to treat her. Unfortunately, their efforts were unsuccessful and Goggin was pronounced dead at the hospital approximately 50 minutes later. Based on those undisputed facts, the court concludes that, regardless of the unfortunate outcome, no reasonably jury could determine that Dr. Vinik was deliberately indifferent to Goggin's serious medical needs in the Acute Medical Unit, or that he did not take "reasonable efforts to avoid or alleviate" any perceived harm to Goggin after she arrived. *Despain*, 264 F.3d at 975.

With the benefit of hindsight, Plaintiff claims Dr. Vinik might have ordered different treatments or ordered them earlier. However, Defendants contend that is not the standard to find a constitutional violation. Defendants note that the cases are clear that "[n]o Eighth Amendment violation can arise from a situation where 'a doctor merely exercises his considered medical judgment' and 'resolves the question whether additional diagnostic techniques or forms of treatment' are required." *Boyett v. Cty. of Wash.*, 282 Fed. Appx. 667, 675 (10th Cir. 2008) (quoting *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)). Similarly, Defendants contend, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 105-06.

The court agrees with Defendants' arguments. Based on those arguments, and on the undisputed facts, the court concludes that Dr. Vinik is entitled to qualified immunity.

### C. Winder and Cook

Defendants correctly assert that neither Winder nor Cook was involved in Goggin's medical care. Indeed, there is no evidence to indicate that either of them had any connection, direct or otherwise, to the alleged constitutional violation at issue, let alone that they were deliberately indifferent to Goggin's serious medical needs. As such, both Winder and Cook are entitled to qualified immunity. *See Boyett*, 2006 WL 3422104, at *20 (finding qualified immunity for named defendant where there was "no evidence in the record as to what, if any, direct contact [he had] with" the injured party).

## D. Conclusion

Based on the foregoing, the court concludes that the individually named Defendants (Smith, Hardy, Evans, Dr. Wilcox, Dr. Vinik, Winder, and Cook) are entitled to qualified immunity in this case.

## II. Cruel and Unusual Punishment Under the Eighth Amendment

Plaintiff may recover in this case for the alleged cruel and unusual punishment of Goggin only if Defendants were "deliberate[ly] indifferen[t] to the serious medical needs" of Goggin. *Estelle*, 429 U.S. at 104. The test for deliberate indifference under the Eighth Amendment has "both an objective and a subjective component." *Sealock*, 218 F.3d at 1209. The objective component is met if the harm suffered is "sufficiently serious" to implicate the Cruel and Unusual Punishment Clause. *See Farmer*, 511 U.S. at 834 (quotations and citations omitted). The subjective component "is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S. at 837). It is not enough to allege that prison officials failed "to alleviate a significant risk that [they] should have perceived but did not." *Farmer*, 511 U.S. at 838; *see also Estelle*, 429 U.S. at 105-06 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'").

Defendants contend that, for the reasons discussed previously, no reasonable juror could find that Defendants were deliberately indifferent to the serious medical needs of Goggin. Defendants argue that the undisputed facts set forth above show that their conduct was not close to the required standard of deliberate indifference in this case. Defendants contend that, based on the records of extensive interactions by Goggin with medical personnel, as well as their

documented efforts to treat Goggin's observed condition and reported complaints, no reasonable

jury could conclude that Defendants were "aware of facts from which the inference could be

drawn that a substantial risk of serious harm exist[ed], and . . . also dr[ew] the inference,"

*Farmer*, 511 U. S. at 837, but nonetheless deliberately disregarded it. *See Sealock*, 218 F.3d at

1209; *see also Despain*, 264 F.3d at 975 ("If an official is aware of the potential for harm but

takes reasonable efforts to avoid or alleviate that harm, he bears no liability under this

standard.").

 In this regard, Defendants contend that one of the *Boyett* decisions cited herein is

particularly helpful. *See Boyett*, 2006 WL 3422104, at *25-33. In that case, the plaintiffs sought

to hold Washington County liable for what they alleged was constitutionally deficient medical

treatment of Mr. Boyett by jail staff. *See id.* Although the plaintiffs in *Boyett* generally "cite[d]

'reasonable medical standards of care' and allege[d] employees of Washington County violated

those standards," the court found "it [was] clear" that Mr. Boyett "received extensive medical

care and jail officials were not indifferent to his needs." *Id.* at *30. That was so despite the

plaintiffs' argument that, notwithstanding the provision of treatment, the extent and timeliness of

those treatments should have been different. *See id.* In response, the *Boyett* court held:

> The plaintiff has not shown the jail officials' treatment modalities
> violated Mr. Boyett's constitutional rights. Instead, the plaintiff's
> claims sound in negligence – a standard that does not give rise to
> municipal § 1983 liability. . . . [I]t is clear Mr. Boyett received
> extensive medical care and jail officials were not indifferent to his
> needs. . . . [E]ven if all the plaintiff's "if only" claims were
> meritorious, failure of correctional staff to follow the plaintiff's
> recommended courses of action does not constitute a civil rights
> violation – there is simply no evidence any defendants drew
> inferences that Mr. Boyett suffered from untreated serious medical
> conditions. Therefore, the plaintiff's claim Washington County

> maintained unconstitutional customs of not treating medical needs does not survive summary judgment.

*Boyett*, 2006 WL 3422104, at \*30; *see also id.* at \*29 ("Moreover, the evidence fails to support an inference jail officials failed to treat any complaints or medical conditions of which they were aware. In fact, jail officials appear to have taken particular care to address any complaints of which they had knowledge.").

Based on the relevant authorities, including the *Boyett* decision cited above, and the undisputed facts set forth above, the court concludes that no reasonable jury could conclude that Defendants were were "deliberate[ly] indifferen[t] to the serious medical needs" of Goggin. *Estelle*, 429 U.S. at 104. Therefore, Defendants are entitled to judgment on this claim.

## III. "Failure to Train and/or Supervise"

This claim is asserted against the County and the supervisory Defendants, Winder, Cook and Wellcon. Defendants present alternative arguments in support of their claim that they are entitled to summary judgment on this claim. The court will address them in turn.

### A. No Constitutional Violation

"A municipality may not be held liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993). Because there was no constitutional violation by any of the individually named Defendants or any other officer or employee of the County, the County, as a matter of law, is not liable. The same is true for the supervisory Defendants named in this case, Winder, Cook, and Wellcon. *See Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) (holding that supervisory liability, if any, is necessarily premised on a conclusion that the supervisor's subordinates violated the Constitution).

24

## B.  The County

For an alternative reason, the County is not liable for "Failure to Train and/or Supervise." Defendants assert that even if a constitutional violation had been established, which it has not, municipal governments incur liability under 42 U.S.C. § 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Defendants contend that where, as here, there is no unconstitutional policy, practice, or custom, which will be discussed below, the purported inadequacy of training may serve as the basis for municipal liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the state actor may come into contact.  *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).  "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a 'policy or custom' that is actionable under § 1983.  *Id*. at 389; *see also Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) ("[T]he failure to train must reflect[ ] a deliberate or conscious choice by a municipality." (quotations and citations omitted) (second alteration in original)).

Defendants assert that there is no evidence in this case that the County or supervisory Defendants adopted a policy of not training, or accepted a permanent and well-settled practice of not training, ADC medical or mental health personnel.  Defendants contend that, to the contrary, training of the nurses, mental health professional, and doctors resulted in Goggin timely and appropriately being identified as at risk for withdrawal syndrome.  Defendants assert that training of the nurses, mental health professional, and doctors also resulted in screening orders and

repetitive screenings to assess Goggin and to help her maintain her fluid intake while treating her nausea and vomiting. Finally, Defendants assert that the training of the nurses and doctors also resulted in repetitive monitoring of Goggin's heart rate and other vital signs, and the escalation of Goggin's care as soon as her heart rate increased over her baseline and was not responsive to oral fluids. Defendants argue that rather than evidencing no training, the record in this case amply demonstrates that all the individually named Defendants were well trained and effective in recognizing, assessing, treating, monitoring, and, if necessary, escalating treatment for alcohol or drug withdrawal. Defendants further contend that the record shows that Goggin's CIWA scores never suggested she had significant withdrawal symptoms or severe dehydration and that she was promptly referred to the Doctor Call List, and from there to the Acute Medical Unit, as soon as her vital signs increased over her baseline and were not responsive to oral fluids.

The court agrees with all of those arguments and concludes that, based on the undisputed facts, no reasonable jury could find that the County's training or the conduct of its employees evidences deliberate indifference to the rights of Goggin. *See Harris*, 489 U.S. at 388.

### C. Supervisory Defendants

As to the supervisory Defendants named in this claim, Winder, Cook, and Wellcon, Defendants alternatively argue that even if a constitutional violation by subordinates had been established, "there is no concept of strict supervisor liability under section 1983." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quotations and citations omitted). Defendants further argue that there is no supervisor liability based on "mere negligence." *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997). Instead, to establish supervisor liability under section 1983, "the plaintiff must establish a deliberate, intentional act by the supervisor to violate constitutional

rights." *Jenkins*, 81 F.3d at 994-95 (quotations and citations omitted). Defendants contend that supervisory Defendants may thus be held liable for the alleged unconstitutional acts of their subordinates only if they actively "participated or acquiesced in the constitutional deprivations." *Winters v. Bd. of Cnty. Comm'rs*, 4 F.3d 848, 855 (10th Cir. 1993); *see Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) ("For supervisory liability [in a section 1983 action], plaintiffs must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation . . . .").

In specific regard to an alleged failure to train, a "lack of training claim fails without proof that [the supervisor] made a conscious decision to adopt a policy of not training or accepted a permanent and well-settled practice of not training." *Boyett*, 2006 WL 3422104, at *23. Here, there is no evidence at all that any of the supervisory Defendants in this case made such a decision or acceptance. To the contrary, the undisputed facts demonstrate that the subordinates in question were trained, and were trained well. The court concludes that no reasonably jury could conclude otherwise.

With respect to an alleged failure to supervise, "liability for failure to supervise or correct misconduct requires the defendant be 'adequately put on notice of the prior misbehavior.'" *Boyett*, 2006 WL 2422104, at *23 (quoting *McClelland v. Facteau*, 610 F.2d 693, 697 (10th Cir. 1979)). Whether a supervisor is found to have had the requisite notice is evaluated using the standard of a reasonable person under the circumstances. *See McClelland*, 610 F.2d at 697. Only when such notice has been established can there be a supervisory duty (if any) to take affirmative steps to prevent violation of potential plaintiff's rights. *Id*. at 698. In this case, there is no evidence that the supervisory Defendants were adequately put on notice of any actual

training deficiencies. Accordingly, the court concludes that no reasonable jury could conclude otherwise.

## D. Conclusion

Based on the foregoing, the court concludes that the County and the supervisory Defendants, Winder, Cook, and Wellcon, are entitled to summary judgment on this claim.

## IV. "Unlawful Custom, Policy[,] or Practice"

With respect to the County, as noted above, "[a] municipality may not be held liable [for constitutional violations] where there was no underlying constitutional violation by any of its officers." *Hinton*, 997 F.2d at 782. Here, Defendants argue that because there was no constitutional violation by any of the individually named Defendants or any other officer or employee of the County, the County, as a matter of law, is not liable. The court agrees.

Also as noted above, Defendants argue that even if a constitutional violation had been established, which it has not, municipal governments incur liability under 42 U.S.C. § 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690; *see also City of Springfield v. Kibbe*, 480 U.S. 257, 267 (1987) ("[T]he Court repeatedly has stressed the need to find a direct causal connection between municipal conduct and the constitutional deprivation."). Defendants assert that, moreover, where the identified policy, if any exists, is constitutional on its face, "considerably more proof than [a] single incident will be necessary . . . to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Okla. City v. Tuttle*, 471 U.S. 808, 823 (1985) (footnotes omitted).

28

Here, there is no evidence of any policy, practice, or custom of the County that negatively affected the care and treatment received by Goggin while she was incarcerated at the ADC. To the contrary, the policies followed by the nurses, mental health professional, doctor, and others resulted in Goggin timely and appropriately being identified as at risk for withdrawal syndrome. The policies followed by the nurses, mental health professional, doctors, and others also resulted in screening orders and repetitive screenings to assess Goggin and to help her maintain her fluid intake while treating her nausea and vomiting, as well as prompt responses by them to each request from her for assistance. The policies followed by the nurses, mental health professional, doctor, and others also resulted in repetitive monitoring of Goggin's heart rate and other vital signs, and the escalation of Goggin's care as soon as her heart rate increased over her baseline and was not responsive to oral fluids.

In sum, there is no evidence that any policy, practice, or custom negatively affected Goggin's care and treatment or that any such policy or practice, if it existed, was directly causally connected to any alleged constitutional violation. *See Kibbe*, 480 U.S. at 267. Accordingly, Defendants are entitled to summary judgment on this claim.

## V. Cruel and Unusual Punishment and "Unnecessary Rigor" Under the Utah State Constitution

Plaintiff may not recover damages under article I, section 9 of the Utah State Constitution unless she shows that Goggin's injury was caused by a jail employee "who acted with deliberate indifference or inflicted unnecessary abuse upon" her. *Bott v. DeLand*, 922 P.2d 732, 740 (Utah 1996), *overruled in part on other grounds by Spackman ex rel. Spackman v. Bd. of Educ. Of Box Elder Cnty. Sch. Dist.*, 16 P. 3d 533 (Utah 2000).

As with the Eighth Amendment to the United States Constitution, the deliberate indifference standard for purposes of state constitutional claims differentiates between inadvertent misconduct, which does not give rise to liability, and the unnecessary and wanton infliction of pain, which does.  As the Utah Supreme Court has explained:

> For example, a physician who is guilty of medical malpractice is not guilty of a constitutional violation "merely because the victim is a prisoner."  [*Estelle*, 429 U.S.] at 106; *El'Amin v. Pearce*, 750 F.2d 829, 832 (10th Cir. 1984); *Brown v. Schiff*, 614 F.2d 237, 239 (10th Cir. 1980).  Similarly, a prison worker's inadvertent failure to provide adequate medical care would not support a constitutional claim for damages.  *Estelle*, 429 U.S. at 105; *Olson v. Stotts*, 9 F.3d 1475, 1476-77 (10th Cir. 1993); *Daniels v. Gilbreath*, 668 F.2d 477, 488 (10th Cir. 1982).

*Bott*, 922 P.2d at 740.

"Unlike the deliberate indifference standard, the unnecessary abuse standard has not been widely explored."  *Bott*, 922 P.2d at 740.  Under this standard, the main consideration is "whether a particular prison or police practice would be recognized as an abuse to the extent that it cannot be justified by necessity."  *Id*. (quotations and citation omitted).  "The definition of abuse focuses on needlessly harsh, degrading, or dehumanizing treatment of prisoners."  *Id*. (quotations and citation omitted).

Finally, to recover monetary damages for an alleged violation of Goggin's constitutional rights, Plaintiff must establish, among other things, that Goggin suffered a flagrant violation of her constitutional rights.  *See Dexter v. Bosko*, 184 P.3d 592, 597-98 (Utah 2008).  The flagrant violation element "ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [himself] liable for a constitutional violation."  *Id*. at 598 (quotations and citation omitted) (alteration in original).

30

For substantially the same reasons that Defendants are entitled to summary judgment on Plaintiff's Eighth Amendment claim and the individually named Defendants are entitled to qualified immunity, the court concludes that no reasonable jury could determine that Defendants are liable under Plaintiff's Utah State Constitutional claim. Furthermore, even if a jury agreed that Defendants, despite Goggin's low CIWA scores and vital signs within the normal range, were mistaken in their assessments of Goggin's condition and should have ordered significant medical intervention earlier, that would be insufficient to impose liability in this case. *See Bott*, 922 P.2d at 740 ("[A] physician who is guilty of medical malpractice is not guilty of a constitutional violation . . . . Similarly, a prison worker's inadvertent failure to provide adequate medical care would not support a constitutional claim for damages." (quotations and citations omitted); *see also Dexter*, 184 P.3d at 598 (holding that the "flagrant violation" requirement for monetary liability "ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [himself] liable for a constitutional violation" (quotations and citation omitted) (alteration in original)).

For these reasons, the court concludes that Defendants are entitled to summary judgment on this cause of action.

## VI. Punitive Damages

Defendants argue that punitive damages may not be awarded against the County. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) ("[W]e hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983."); *Ray v. City of Edmond*, 662 F.2d 679, 680 (10th Cir. 1981) (applying *City of Newport* to reverse award of punitive damages against a municipality). Defendants assert that Plaintiff's demands for punitive damages against

the County are thus defective as a matter of law and should be dismissed. In her memorandum in opposition to Defendants' motion, Plaintiff concedes that her punitive damages claim against the County is not viable. As such, the County is entitled to summary judgment on this claim.

As against the other named Defendants, Defendants argue that punitive damages may be awarded only if their "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983); *see also id.* ("We further hold that this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness.").

Defendants contend that the undisputed facts in this case amply demonstrate that, consistent with their training and ADC policies, they diligently recognized, assessed, treated, monitored, and when necessary escalated Goggin's medical treatment. Goggin's CIWA scores never suggested she had significant withdrawal symptoms or severe dehydration. Goggin was promptly referred to the Doctor Call List and, from there, to the Acute Medical Unit, when her vital signs increased over her baseline and were not responsive to oral fluids. Based on those undisputed facts, the court concludes that no reasonably jury could determine that Defendants actions could be characterized as having an "evil motive or intent" or a "callous indifference" to Goggin's rights. *Id.* Accordingly, the Defendants other than the County are likewise entitled to summary judgment on this claim.

## CONCLUSION AND ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment[6] is **GRANTED**. Plaintiff's complaint in this case is **DISMISSED WITH PREJUDICE**. The Clerk of the Court is directed to close this case.

**IT IS SO ORDERED**.

DATED this 29th day of September, 2014.

BY THE COURT:

PAUL M. WARNER
United States Magistrate Judge

---

[6] *See* docket no. 51.